JENNIFER WALKER ELROD, Circuit Judge:
This appeal addresses the Texas Public Utilities Commission’s (PUC) interpreta *384 tion and implementation of a federal statutory and regulatory scheme governing the purchase of energy between public utilities and certain energy production facilities known as Qualifying Facilities. Appellees are qualifying wind generation facilities collectively known as Exelon that challenged a state rule and order which prohibited Exelon from forming Legally Enforceable Obligations when selling power. The district court determined that it had jurisdiction to hear Exelon’s claims and then granted summary judgment to Exe-lon. We disagree. We VACATE the portion of the judgment regarding Exelon’s challenge to the PUC’s order and direct the district court to dismiss for want of subject matter jurisdiction. As to the remaining claims challenging the PUC’s rule, we REVERSE and REMAND because the PUC acted within its discretion and properly implemented the federal regulation at issue here.
I.
Congress enacted the Public Utilities Regulatory Policies Act of 1978 (PURPA) to reduce the dependence of electric utilities on foreign oil and natural gas and to control consumer costs. Congress sought to do so in part by encouraging development of alternative energy sources. See FERC v. Mississippi, 456 U.S. 742, 745, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982); Power Res. Grp. v. Pub. Util. Comm’n, 422 F.3d 231, 233 (5th Cir.2005) [hereinafter Power Resource III J.[1] PURPA directs the Federal Energy Regulatory Commission (FERC) to promulgate regulations to promote energy purchases from cogeneration and small power production facilities, in-cluding renewable energy providers such as wind and solar generators. These energy providers are known as Qualifying Facilities. See 16 U.S.C. §§ 796(17), 824a-3(a); 18 C.F.R. §§ 292.101(b)(1), 292.203. While Congress sought to promote energy generation by Qualifying Facilities, it did not intend to do so at the expense of the American consumer. PURPA thus strikes a balance between these two interests. For example, PURPA requires utilities to purchase power generated by Qualifying Facilities, but also mandates that the rates that utilities pay for such power “shall be just and reasonable to the electric consumers of the electric utility and in the public interest.” 16 U.S.C. § 824a-3(a)(2), (b)(1).
“State regulatory agencies, such as the PUC, are directed to adopt rules which comply with FERC’s regulations and implement PURPA.” Power Resource III, 422 F.3d at 233 (citing 16 U.S.C. § 824a-3(f)). In other words, PURPA orders the states to implement a federal law. This unusual mandate differs from many other statutory regimes, where the states are given the option to either implement the federal law themselves or else have the federal government directly enforce the law. See New York v. United States, 505 U.S. 144, 167-68, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (citing the Clean Water Act, Occupational Safety and Health Act, and Resource Conversation and Recovery Act and explaining that “where Congress has the authority to regulate private activity under the Commerce Clause, we have recognized Congress’ power to offer States the choice of regulating that activity according to federal standards or having *385 state law pre-empted by federal regulation”).
As the Supreme Court has noted, the mandatory nature of PURPA’s directive to states raises “troublesome” Tenth Amendment concerns. FERC v. Mississippi, 456 U.S. at 759, 102 S.Ct. 2126. In FERC v. Mississippi the Supreme Court was able to avoid those concerns by explaining that FERC’s regulations allow the states to implement PURPA simply by adjudicating disputes arising under the statute. Id. at 760, 102 S.Ct. 2126. The Supreme Court found PURPA acceptable because it does not require states to pass regulations implementing FERC’s regulations; instead, states have the option of “resolving disputes on a case-by-case basis” by opening up their courts to adjudicate such claims. Id. at 751, 760, 102 S.Ct. 2126. Texas has opted to have the PUC implement FERC’s regulations through rulemaking, rather than case-by-case adjudication.[2]
FERC provides state regulatory authorities like the PUC “great latitude in determining the manner of implementation of the Commission’s rules, provided that the manner chosen is reasonably designed to implement the requirements” of FERC regulations. See Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed.Reg. 12214, 12280-31 (Feb. 25, 1980). At issue here is one of the rules that the PUC promulgated to implement a FERC regulation.
This FERC regulation provides Qualifying Facilities with two ways to sell power to utilities. See 18 C.F.R. § 292.304(d) (FERC’s Regulation). Under subsection (d)(1) of FERC’s Regulation, a Qualifying Facility may only provide power to the utility on an “as-available” basis, and must price the power at the “time of delivery.” Id. § 292.304(d)(1). Immediately following (d)(1) is another subsection of FERC’s Regulation, which allows a Qualifying Facility to sell its power pursuant to a Legally Enforceable Obligation. Id. § 292.304(d)(2). A Qualifying Facility that chooses to sell through a Legally Enforceable Obligation has two options for how it prices its power: It may calculate the price at the moment of delivery, just as under subsection (d)(1), or it may choose to fix the price “at the time the obligation is incurred.” Id. In other words, Qualifying Facilities that form Legally Enforceable Obligations are able to select between the current (as-available) and past (time of obligation) market prices for power.
The PUC’s rule implementing FERC’s Regulation permits only a Qualifying Facility that generates “firm power” to enter into a Legally Enforceable Obligation. 16 Tex. Admin. Code § 25.242(c) (PUC Rule 25.242). The PUC defines “firm power” as “power or power-producing capacity [from a Qualifying Facility] that is available pursuant to a legally enforceable obligation for scheduled availability over a specified term.” Id. § 25.242(c)(5). The PUC defines non-firm power from a Qualifying Facility as “[p]ower provided under an arrangement that does not guarantee scheduled availability, but instead provides for delivery as available.” Id. § 25.242(c)(9). In other words, only those Qualifying Facilities able to forecast when they will deliver energy to the utility — and capable of delivering the specified amount of energy at the scheduled time — are eligible to take advantage of the pricing options in subsection (d)(2) of FERC’s Regu *386 lation. By contrast, Qualifying Facilities with non-firm power that cannot guarantee such delivery may charge the utility only the current or “as-available” market price for the power.
Exelon is a Qualifying Facility, but cannot supply firm power, due in part to the nature of wind generation. Wind is a notoriously fickle energy source, as it blows intermittently and the power it generates is difficult to store.[3] Technological advancements have made it possible for some wind farms to provide more consistent service, but Exelon lacks such technology, and the winds in the Texas Panhandle, where Exelon’s facilities are located, do not blow in a predictable pattern. Because it is subject to the whims of these winds, Exelon cannot guarantee that a particular amount of energy will be available at a particular time.
Southwestern Public Service Company (Southwestern) is a utility company that is required under PURPA to buy all of Exe-lon’s wind-generated energy. See 16 U.S.C. § 8241-3(a)(3). At various times in 2005 and 2006, Exelon sent letters to Southwestern demanding that Southwestern purchase Exelon’s energy output for the next twenty years, and purported to create Legally Enforceable Obligations with Southwestern. Exelon further demanded that Southwestern pay Exelon amounts that ranged from approximately $0,035 per kilowatt-hour to more than $0,090 per kilowatt-hour for the first nine years of that twenty-year term. Southwestern refused to accept Exelon’s terms. According to Southwestern, these rates were much higher than the as-available prices offered by other generators. Southwestern asserted that Exelon could not form a Legally Enforceable Obligation under subsection (d)(2) because it could not provide firm power. As a result, Southwestern argued that Exelon could not charge more than the as-available prices allowed under subsection (d)(1).
In June 2007, Exelon filed a complaint with the PUC alleging that it had formed a Legally Enforceable Obligation with Southwestern, and that Southwestern was underpaying for its power. Exelon’s complaint did not challenge PUC Rule 25.242 or any other Texas rule implementing FERC’s regulations under PURPA. Instead, Exelon argued in the PUC proceeding that its power was firm because Exe-lon promised to sell all of the power it produced to Southwestern. Exelon’s case was first heard by an administrative law judge at the PUC. The administrative law judge determined that Exelon’s power was *387 non-firm, that it had not created a Legally Enforceable Obligation, and that it was not entitled to additional compensation.[4]
The PUC Commission issued an order (PUC Order) that adopted the administrative law judge’s conclusions, with one notable exception. The administrative law judge had proposed including a categorical finding that wind generators could not create Legally Enforceable Obligations because “wind generated power is not readily available.” The Commission rejected this proposal. Instead, the Commission concluded that while Exelon was unable to produce firm power, other wind generators may be able to do so and may therefore be capable of forming Legally Enforceable Obligations. The PUC Order noted this conclusion:
The [administrative law judge] found that wind-generated power is not readily available. The Commission disagrees with this broad statement encompassing all wind-generated power. The Commission notes that disparate wind patterns in the diverse geographic regions of the state can result in significantly different characteristics for wind-generated power. Further combining wind with energy storage techniques or other energy sources, like solar energy, can also result in significant differences.
Exelon appealed the PUC’s ruling to the state district court in Travis County, Texas. While the state court appeal was pending, Exelon filed a petition for enforcement and request for declaratory order from FERC, arguing that all Qualifying Facilities are entitled to create Legally Enforceable Obligations, regardless of whether the energy they produce is firm or non-firm. FERC declined to initiate an enforcement action against the PUC, and instead issued an informal declaratory order (FERC’s Letter) stating that the PUC Order was inconsistent with FERC’s Regulation. FERC’s Letter stated that a Qualifying Facility may form a Legally Enforceable Obligation even if its power is non-firm.[5]
Exelon voluntarily non-suited its state court appeal of the PUC Order. In December 2009, Exelon filed this lawsuit in federal district court seeking declaratory and injunctive relief against the PUC Commissioners in their official capacities. In its complaint, Exelon requested that the district court declare that: (1) the PUC Order did not implement FERC’s Regulation; (2) all Qualifying Facilities may form Legally Enforceable Obligations; and (3) *388 the PUC must reopen the proceeding brought by Exelon in light of these determinations. Exelon also requested an injunction: (1) requiring the PUC to fully implement FERC’s Regulation; (2) prohibiting the PUC from enforcing the PUC Order; and (3) requiring the PUC to address and consider Exelon’s petition in light of those declarations.
Southwestern and Southwestern’s biggest consumer, Occidental Permian Limited (Occidental), intervened. The PUC, Southwestern, and Occidental moved to dismiss Exelon’s claims under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), arguing that PURPA grants exclusive jurisdiction to state courts to hear the sort of claims advanced by Exelon. The district court disagreed, and concluded that it had jurisdiction to hear the case.
The parties then moved for summary judgment. The district court issued an order granting Exelon’s motion for summary judgment and denying all other motions for summary judgment. The district court concluded that the PUC Order failed to implement PURPA and permanently enjoined the PUC from requiring a Qualifying Facility to provide firm power as a condition of creating a Legally Enforceable Obligation. The district court subsequently amended its judgment to enjoin the PUC Commissioners, rather than the PUC itself. The PUC, Southwestern, and Occidental (collectively, Appellants) appealed.
II.
We begin by addressing Appellants’ argument that there is no subject matter jurisdiction to hear Exelon’s claims. We review de novo a district court’s determination of subject matter jurisdiction. In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (Miss.Plaintiffs), 668 F.3d 281, 286 (5th Cir.2012). Exelon, as the plaintiff, has the burden of establishing subject matter jurisdiction. Id. If we conclude that there is no subject matter jurisdiction, the case must be dismissed. Home Builders Ass’n, Inc. v. City of Madison, 143 F.3d 1006, 1010 (5th Cir.1998).
PURPA provides for two types of review of a state utility regulatory authority’s actions: implementation and as-applied challenges. See Power Resource III, 422 F.3d at 234-35. Federal courts have exclusive jurisdiction over implementation challenges, while state courts have exclusive jurisdiction over as-applied challenges.[6] The type of claims brought by Exelon thus determines whether we have jurisdiction. Id. at 235. “An implementation claim involves a contention that the state agency ... has failed to implement a lawful implementation plan under § 824a-3(f) of PURPA, whereas an ‘as-applied’ claim involves a contention that the state agency’s ... implementation plan is unlawful, as it applies to or affects an individual petitioner.” Id. (internal quotation marks and citations omitted); see also 16 U.S.C. § 824a-3(g).
The parties disagree as to whether Exe-lon asserted as-applied or implementation *389 challenges. Appellants make several arguments for why these were as-applied challenges over which the district court had no jurisdiction. First, Appellants contend that Exelon is challenging the PUC Order, which only applies to Exelon, rather than PUC Rule 25.242. Next, Occidental asserts that, although we treated similar claims as implementation challenges in Power Resource III, that determination is not binding here. Finally, the PUC argues that we must read PURPA’s jurisdictional grant to federal courts narrowly in order to avoid the “troublesome” Tenth Amendment concerns identified by the Supreme Court in FERC v. Mississippi We address each of these points in turn.
A.
Appellants argue that Exelon raised as-applied challenges because Exelon only challenged the PUC’s application of PUC Rule 25.242 to Exelon. In response, Exe-lon contends that this was an implementation challenge because the PUC Order had broad effects, and because the PUC Order and PUC Rule 25.242 together fail to implement FERC’s Regulation. The district court agreed with Exelon, and characterized Exelon’s claims as implementation challenges. The district court first reasoned that Exelon was asserting that it was entitled to form a Legally Enforceable Obligation under FERC’s Regulation. The district court explained that, because the PUC Order denied Exelon the right to create a Legally Enforceable Obligation, Exelon was challenging that PUC Order as a failure to implement FERC’s Regulation. Second, the district court determined that the PUC Order “implicitly broadened its findings when it explained what other conditions could allow a wind energy facility to succeed in providing firm power” and thus concluded that the PUC Order did not limit its effect only to Exe-lon. We agree with the district court with respect to only some of Exelon’s claims.
i.
To help elucidate the difference between implementation and as-applied challenges, we begin by reviewing our decision in Power Resource III, 422 F.3d at 231. There, the PUC had determined that a Qualifying Facility called PRG could not form a Legally Enforceable Obligation because it could not guarantee power delivery within ninety days, as required by PUC Rule 23.66. Id. at 234. PRG filed suit in both state and federal court asserting both as-applied and implementation challenges to the PUC’s determination. The Texas state courts adjudicated PRG’s as-applied claims, including whether the PUC properly interpreted its own rule, and whether that interpretation was preempted by FERC’s regulations. See Power Res. Grp., Inc. v. Pub. Util. Comm’n, 73 S.W.3d 354, 356-57 (Tex.App.-Austin 2002, pet. denied) [hereinafter Power Resource I ].
PRG then brought suit in federal district court, where it requested several additional forms of relief, including: (1) a declaration that the PUC had failed to implement the requirements of PURPA; (2) a declaration that the PUC’s actions with respect to PRG violated PURPA; and (3) injunc-tive relief requiring the PUC to implement new Legally Enforceable Obligation regulations, and then requiring the PUC to consider PRG’s petition under that new regulatory framework. See Power Res. Grp. v. Pub. Util. Comm’n, No. 1:03-CV-762-HLH, Dkt. No. 1, at *12 (WD.Tex. Oct. 10, 2003) [hereinafter Power Resource II]. The district court dismissed all but one of PRG’s claims for lack of jurisdiction after determining that they were as-applied challenges:
*390 PRG again asks this Court to grant relief in the form of an order directing [PUC] to consider PRG’s claims under a revised system of regulation.... These allegations state an “as applied” claim, which this Court has no jurisdiction to hear.... [T]he one ultimate and limited issue before the Court at this time is whether [PUC] failed to implement the [Legally Enforceable Obligation] option provided by FERC’s regulations.
Id. (emphasis in the original). The district court then granted summary judgment to the PUC and other defendants on PRG’s implementation claim. We affirmed, without reaching the issue of whether the district court could have also heard PRG’s other claims. Power Resource III, 422 F.3d at 239.
ii.
We now turn to Exelon’s claims, which fall into two main categories. The majority of Exelon’s requests for relief focus on the specific PUC Order, rather than PUC Rule 25.242. For example, Exelon asked the district court for a declaration that the PUC Order did not implement FERC’s Regulation and is preempted. These claims challenging the PUC Order are identical to the as-applied claims that the state court of appeals adjudicated in Power Resource I, 73 S.W.3d at 361-62. Exelon also asked the district court to declare that the PUC must reopen Exelon’s proceedings for further consideration, and to issue an injunction prohibiting the PUC from enforcing the PUC Order. In a thoughtful, well-reasoned opinion, the federal district court in Power Resource II dismissed these types of claims for lack of jurisdiction because they were as-applied challenges. Power Resource II, No. 1:03-CV-762-HLH, Dkt. No. 44, at 17-18. We agree with the conclusions reached by both the state and federal district courts in Power Resource I & II regarding their exclusive jurisdiction under PURPA. Exelon’s challenges to the PUC Order are “contention^] that the state agency’s ... implementation plan is unlawful, as it applies to or affects an individual petitioner” and are thus as-applied challenges over which we have no jurisdiction. Power Resource III, 422 F.3d at 235 (internal quotation marks and citations omitted).[7]
The district court in this case reasoned that Exelon’s claims challenging the PUC Order were implementation challenges based on what it considered to be a broad ruling in the PUC Order that prevented all wind generators from forming Legally Enforceable Obligations. We disagree. The PUC explicitly declined to create a categorical rule preventing wind generators from forming Legally Enforceable Obligations and instead issued an order limited to only Exelon’s capacity to produce firm power:
The [administrative law judge] found that wind-generated power is not readily available. The Commission disagrees with this broad statement encompassing all wind-generated power. The Commission notes that disparate wind patterns in the diverse geographic regions of the state can result in significantly different characteristics for wind-generated power. Further combining wind with energy storage techniques or other *391 energy sources, like solar energy, can also result in significant differences.[8]
The PUC thus left open the possibility that other wind generators might be able to comply with the firm power requirement, either through technological advances or based on their locations in regions with more predictable wind patterns than those found around the Exelon facilities. As both the PUC and Occidental aptly note, the fact that as-applied challenges may establish precedent relevant to future cases does not transform them into facial or implementation challenges. Courts routinely adjudicate as-applied constitutional challenges to statutes; these decisions do not become facial challenges simply because of their stare decisis effect in future eases presenting similar facts or legal theories. Cf. In re Cao, 619 F.3d 410, 430 (5th Cir.2010) (en banc); see also id. at 443 (Jones, C.J., concurring in part and dissenting in part). The PUC Order is best viewed as an application of PUC Rule 25.242 — which the PUC promulgated more than thirty years ago — to an individual petitioner.[9] As a result, Exelon’s challenges to the PUC Order are as-applied challenges.
iii.
Exelon offers one additional argument for why these claims are implementation challenges. Exelon points to FERC’s Letter, which Exelon requested from FERC after receiving an unfavorable ruling from the PUC. While this FERC-issued document is rather impressively called a Declaratory Order, it is actually akin to an informal guidance letter. See Indus. Co-generators v. FERC, 47 F.3d 1231, 1235 (D.C.Cir.1995) (“The Commission nowhere purported to make the Declaratory Order binding upon the FPSC, nor can we imagine how it could do so. Unlike the declaratory order of a court, which does fix the rights of the parties, this Declaratory Order merely advised the parties of the Commission’s position.”). In this Letter, FERC states that Exelon’s claims are implementation challenges. Exelon cites City of Arlington v. FCC, — U.S. —, 133 S.Ct. 1863, 1872, — L.Ed.2d — (2013), and maintains that we should give deference to FERC’s characterization, in its Letter, of these claims as an implementation challenge. Exelon argues that, based on this deference, we should conclude that the federal courts have jurisdiction to hear Exelon’s claims. The district court here adopted Exelon’s position without providing any reasoning or case law in support: “That Exelon is in fact challenging PUC[]’s implementation of PURPA, rather [than] a particular application, is *392 confirmed by the reasoning in the FERC Declaratory Order, and the positions taken by various intervenors before FERC.”
We disagree. In City of Arlington, the Supreme Court afforded Chevron deference to an agency’s interpretation of its own jurisdiction. M[10] Indeed, the Supreme Court explicitly noted that it granted certiorari “limited to the first question presented: Whether ... a court should apply Chevron to ... an agency’s determination of its own jurisdiction.” Id. at 1867-68 (internal quotation marks omitted). In contrast, the question here is not whether FERC has jurisdiction to address Exelon’s claims, but rather whether these claims belong in a state or a federal court. City of Arlington does not address this entirely different proposition advocated by Exelon, and does not support the argument that we should defer to FERC’s interpretation of our own jurisdiction under the statutory scheme.
While the Supreme Court has not addressed this novel argument, our own precedent forecloses it. As Judge Wisdom noted long ago, “[t]he courts, however, have to make their own determination whether the district court has jurisdiction, rather than defer to the [federal agency] in the first instance.” Reeb v. Econ. Opportunity Atlanta, Inc., 516 F.2d 924, 926 (5th Cir.1975); see also Lopez-Elias v. Reno, 209 F.3d 788, 791 (5th Cir.2000) (explaining that “the determination of our jurisdiction is exclusively for the court to decide”). More recently, our sister circuit explained that, “the Supreme Court has repeatedly affirmed that federal courts have an independent obligation to determine their own subject-matter jurisdiction.” Shweika v. Dep’t of Homeland Sec., 723 F.3d 710, 719 (6th Cir.2013) (citing Henderson ex rel. Henderson v. Shinseki, — U.S. —, 131 S.Ct. 1197, 1202, 179 L.Ed.2d 159 (2011); Arbaugh v. Y & H Corp., 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006); Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). “Requiring that a court defer to an agency’s interpretation of the court’s own subject-matter jurisdiction would interfere with this independent obligation.” Id.
Even assuming arguendo that an agency’s interpretation of a court’s jurisdiction could warrant deference, FERC’s Letter would still not be entitled to Chevron deference because it is an informal guidance document. As the Supreme Court has explained, “[interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-style deference.” Christensen v. Harris Cnty., 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Exelon conceded as much at oral argument, and acknowledged that FERC’s Letter is “entitled to respect,” but only to *393 the extent that it is persuasive. Id. (citing Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). Because we find the reasoning in Power Resource I & II more persuasive than FERC’s Letter, we conclude that Exelon’s challenges to the PUC Order are as-applied challenges, over which the district court lacked jurisdiction.
B.
i.
Exelon’s second category of claims challenges PUC Rule 25.242. Exe-lon argues that the Rule does not fully implement FERC’s Regulation because PUC Rule 25.242 limits the category of Qualifying Facilities that may form Legally Enforceable Obligations. In response, Occidental contends that Exelon did not plead a proper implementation challenge because it did not explicitly ask the district court to require the PUC to engage in new rulemaking or to invalidate PUC Rule 25.242. Exelon did, however, raise a more general challenge to PUC Rule 25.242 by asking for a declaration that all Qualifying Facilities may form Legally Enforceable Obligations, and requesting that the court issue an injunction requiring the PUC to fully implement FERC’s regulations. Either form of relief would necessarily require the PUC to alter its current rules. We see little difference between these requests for relief and those that we addressed as implementation challenges in Power Resource III, 422 F.3d at 237-39. Exelon’s claims challenging PUC Rule 25.242 are thus implementation challenges.
Occidental asserts that our “drive-by” jurisdictional ruling in Power Resource III is not entitled to precedential effect. We disagree. While “questions of jurisdiction [that] have been passed on in prior decisions sub silentio ” are not entitled to preclusive effect, Power Resource III is not such a case. See Hagans v. Lavine, 415 U.S. 528, 533 n. 5, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). The district court opinion in Power Resource II devoted substantial time to the jurisdictional question. We, in turn, devoted a large portion of our opinion to recounting the district court’s jurisdictional determination before reaching the merits of the case. See Power Resource III, 422 F.3d at 234-37. The appellant in Power Resource III also briefed the issue of whether the district court erred in determining that it lacked jurisdiction to grant relief on PRG’s as-applied claims. Id. at 239. While our decision in Power Resource III certainly could have given more guidance on its jurisdictional determination, the issue was clearly before the court. Power Resource III is thus distinguishable from cases where we have held that the jurisdictional determination had no precedential effect because the prior court did not appear to consider the issue. See, e.g., USPPS, Ltd. v. Avery Dennison Corp., 647 F.3d 274, 283 (5th Cir.2011) (“No one contends that the propriety of jurisdiction in this Circuit was actually argued to the prior panel or that the prior panel’s decision actually addresses that question.”); Kershaw v. Shalala, 9 F.3d 11, 13 n. 3 (5th Cir.1993) (“[T]he jurisdictional issue was neither raised by the parties nor addressed by the Court.”). Even assuming arguendo that we were not bound by the jurisdictional determination in Power Resource III, we would conclude that the delineation drawn by the district court in Power Resource II between implementation and as-applied challenges is a persuasive reading of PURPA’s text, and would follow the same approach here.
ii.
The PUC insists that we should read PURPA’s jurisdictional grant more nar *394 rowly, based on the Supreme Court’s decision in FERC v. Mississippi, 456 U.S. at 759, 102 S.Ct. 2126. Under the PUC’s view, federal courts only have jurisdiction to hear claims asserting that the PUC has failed to open its doors to adjudicate disputes under PURPA when it is simultaneously hearing similar state lawsuits. While this reading of PURPA’s jurisdictional provisions may be possible, it is not compelled by the Supreme Court’s decision in FERC v. Mississippi, and would conflict with our own prior interpretation of the scope of PURPA’s jurisdictional grant. See Power Resource III, 422 F.3d at 235-37. Absent a clear contrary statement from the Supreme Court or en banc reconsideration, we are bound by our own precedent. See United States v. Stone, 306 F.3d 241, 243 (5th Cir.2002).
Moreover, we do not think that the PUC’s approach is necessary to avoid constitutional problems in this case. As the Supreme Court noted in FERC v. Mississippi, states have the option of implementing FERC’s regulations through state regulations, but may decline to do so if they would prefer to open their state courts only to hear disputes over FERC’s regulations. 456 U.S. at 760, 102 S.Ct. 2126. As a result, Texas was not forced to pass laws implementing FERC’s regulations. Cf. Printz v. United States, 521 U.S. 898, 933, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). Instead, Texas opted to have the PUC promulgate regulations implementing FERC’s Regulations. See Tex. Utils. Code Ann. § 35.061; see also 27 Tex. Reg. 5966, 5968 (2002) (“The commission chooses to continue implementation of PURPA through rulemaking. The commission agrees with Texas [Qualifying Facilities] that implementation on a case-by-case, contested proceeding hearing approach would waste parties’ resources.”). We thus decline to follow Appellants’ approach and adhere instead to the framework we followed in Power Resource III, 422 F.3d at 236.
Accordingly, we VACATE the portion of the judgment regarding Exelon’s challenge to the PUC’s order and direct the district court to dismiss for want of subject matter jurisdiction, and review only Exelon’s claims that PUC Rule 25.242 fails to implement FERC’s Regulation.
III.
We now turn to whether the district court properly granted summary judgment in favor of Exelon on its claims that the PUC failed to implement FERC’s Regulation. “We review a district court’s ruling on a motion for summary judgment de novo and apply the same legal standards as the district court.” Bellard v. Gautreaux, 675 F.3d 454, 460 (5th Cir.2012). “The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a). When ruling on a motion for summary judgment, we are required to review all inferences in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
We review the PUC’s implementation of PURPA and the FERC Regulation with deference because “a state has broad authority to implement PURPA with respect to the approval of purchase contracts between utilities and [Qualifying Facilities].” Power Resource III, 422 F.3d at 236 (citations omitted).
PURPA requires states to implement FERC’s regulations. See 16 U.S.C. *395 § 824a-3(f)(l).[11] States may implement PURPA “by issuing regulations, by resolving disputes on a case-by-case basis, or by taking any other action reasonably designed to give effect to FERC’s rules.” FERC v. Mississippi 456 U.S. at 751, 102 S.Ct. 2126. Here, Texas chose to give effect to FERC’s rules by promulgating regulations. FERC’s Regulation at issue here provides that each Qualifying Facility “shall have the option ... [t]o provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term.” 18 C.F.R. § 292.304(d). We note at the outset that the plain language of PUC Rule 25.242 does not conflict with FERC’s Regulation. Indeed, there is no FERC Regulation or PURPA provision specifically addressing whether non-firm energy providers may form Legally Enforceable Obligations. Exelon claims instead that the PUC failed to implement FERC’s Regulation because PUC Rule 25.242 limits the class of Qualifying Facilities that have the option of forming Legally Enforceable Obligations.[12] Because Congress has left this determination to the PUC, rather than FERC, we disagree.
In determining whether PUC Rule 25.242 fails to implement FERC’s Regulation, we turn once again to our binding precedent in Power Resource III, 422 F.3d at 237-39. The dissenting opinion’s view of this case apparently flows from the view that we are not bound by Power Resource III here. We disagree, and explain below why that ease forecloses the position taken in the dissenting opinion.
A.
In Power Resource III, we upheld the PUC’s determination that PRG — which was also a Qualifying Facility — could not form a Legally Enforceable Obligation because it could not guarantee power delivery within ninety days as required by the PUC’s 90-day Rule. Id. at 234. PRG— like Exelon — argued that the PUC’s 90-day Rule did not meaningfully implement the same FERC Regulation at issue here because the PUC’s 90-day Rule “eviscerate[d]” the Legally Enforceable Obligation option for an entire category of Qualifying Facilities that were unable to meet the rule’s requirements. Id. at 238. We disagreed, and upheld the PUC’s 90-day Rule, explaining that,
*396 PRG has failed to show that PURPA and the FERC regulations mandate that all [Qualifying Facilities], including un-built ones, must be able to create a [Legally Enforceable Obligation] at any time.... FERC regulations grant the states discretion in setting specific parameters for [Legally Enforceable Obligations].
If FERC had determined it necessary to set more specific guidelines concerning [Legally Enforceable Obligations], it could have done so.... The plain text of the FERC regulation, however, fails to mandate that requirement. Rather, defining the parameters for creating a [Legally Enforceable Obligation] is left to the states and their regulatory agencies.
Id. at 238-39 (emphasis added). Power Resource III thus forecloses the dissenting opinion’s first argument, that under the plain language of FERC’s Regulation, all Qualified Facilities must always be allowed to enter into Legally Enforceable Obligations. Instead, Power Resource III held that state regulatory agencies — rather than FERC — were empowered to define the parameters of the circumstances in which Qualified Facilities could form Legally Enforceable Obligations. Id. It is this essential holding which binds us here: under the cooperative federalism scheme created by PURPA, it is the PUC, rather than FERC, that defines the parameters for when a Qualified Facility may form a Legally Enforceable Obligation.
The same holds true here. The PUC had the discretion to determine the specific parameters for when a wind farm can form a Legally Enforceable Obligation, and through regulation determined that only when a wind farm can provide firm power may it enter into a Legally Enforceable Obligation. This does not, as the dissenting opinion fears, prevent all wind farms from ever forming Legally Enforceable Obligations. To the contrary: As we noted in our jurisdictional analysis, the PUC explicitly left open the possibility that other wind farms might be able to provide firm power, and thus form Legally Enforceable Obligations. Even Exelon is not, as the dissenting opinion claims, “ineligible” to form a Legally Enforceable Obligation. If Exelon is able to demonstrate that it can provide firm power, either through modification or through advances in technology, then it too may enter into Legally Enforceable Obligations.[13] Cf. Matthew L. Wald, Texas Is Wired for Wind Power, and More Farms Plug In, N.Y. Times, July 24, 2014, at B1 (noting improvements in transmission infrastructure for Texas wind farms).
Here, just as in Power Resource III, the mere fact that PUC Rule 25.242 prevents some Qualifying Facilities from entering into Legally Enforceable Obligations at certain times does not mean that the PUC failed to implement FERC’s Regulation. As we said in Power Resource III, “[t]he *397 plain text of the FERC regulation ... fails to mandate” that all Qualifying Facilities be allowed to form Legally Enforceable Obligations. Id. at 239. To determine otherwise here would put us in conflict with our own controlling precedent in Power Resource III.
B.
Exelon maintains that we should instead defer to FERC’s Letter, which determined that PUC Rule 25.242 failed to implement, and was inconsistent with, FERC’s Regulation. Specifically, FERC interpreted its Regulation to allow all Qualifying Facilities — even those that produce non-firm power — to form Legally Enforceable Obligations. Exelon conceded at oral argument that FERC’s Letter is not entitled to deference under either Chevron or Auer v. Robbins, 519 U.S. 452, 457, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997).[14] Instead, Exelon argues that we ought to give weight to FERC’s informal determination based on its persuasive value. We disagree for several reasons.
We begin by noting that FERC is not a party to this litigation, and did not take a position on this question of interpretation before our court. FERC’s involvement in this case has been limited to sending Exe-lon a single letter that supports the position that Exelon has taken in this case. We cannot defer to Exelon’s proffered interpretation of the FERC Regulation, because it is foreclosed by our own reading of the Regulation in Power Resource III.[15]
Even if Exelon had not conceded that FERC’s Letter was entitled to no deference under Chevron and Auer, a court’s prior construction of a statute trumps an agency construction otherwise entitled to Chevron deference when the prior court decision held that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion. Nat'l Cable & Telecomm. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 982, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005).[16]
Power Resource III makes clear that our prior reading of FERC’s Regulation unambiguously forecloses the interpretation offered by Exelon here:
If FERC had determined it necessary to set more specific guidelines concerning [Legally Enforceable Obligations], it could have done so. For example, the FERC regulations could have mandated *398 that the [Qualifying Facilities] must be able to lock in purchase rates with a [Legally Enforceable Obligation] prior to construction of a facility. The plain text of the FERC regulation, however, fails to mandate that requirement. Rather, defining the parameters for creating a [Legally Enforceable Obligation] is left to the states and their regulatory agencies.
Power Resource III, 422 F.3d at 239 (emphasis added).
Our approach does not, as the dissenting opinion argues, “flip [] Brand X on its head.” Dissent at 21. Rather, it is a straight-forward application of the doctrine, which is consistent with the way in which this court and our sister circuits have applied the decision. See Burks v. United States, 633 F.3d 347, 360 (5th Cir.2011); Tran v. Mukasey, 515 F.3d 478, 484 (5th Cir.2008); Sierra Club v. Envt’l Prot. Agency, 479 F.3d 875, 880-84 (D.C.Cir.2007) (vacating an EPA rule that conflicted with circuit precedent and explaining that the EPA “must obey the Clean Air Act as written by Congress and interpreted by this court”).
Our decision is also consistent with the approach used in cases where our sister circuits have previously interpreted statutes and regulations to be ambiguous, and thus deferred to the agency’s interpretation following the Supreme Court’s ruling in Brand X, 545 U.S. 967, 125 S.Ct. 2688. In those cases, the courts emphasize that their prior decisions also noted ambiguity in the text at issue. See, e.g., Garfias-Rodriguez v. Holder, 702 F.3d 504, 512 (9th Cir.2012) (“We wrote in Acosta that ‘[t]he statutes involved do not clearly indicate whether the inadmissibility provision or the penalty-fee adjustment of status provision should take precedence,’ and reached our conclusion by relying heavily on our earlier Perez-Gonzalez decision.”); Hernandez-Carrera v. Carlson, 547 F.3d 1237, 1245 (10th Cir.2008) (“The Supreme Court has twice explicitly found the statute to be ambiguous.”); Fernandez v. Keisler, 502 F.3d 337, 347-48 (4th Cir.2007) (“We thus do not hold that a court must say in so many magic words that its holding is the only permissible interpretation of the statute in order for that holding to be binding on an agency. In many instances, courts were operating without the guidance of Brand X, and yet the exercise of statutory interpretation makes clear the court’s view that the plain language of the statute was controlling and that there existed no room for contrary agency interpretation.”); Dominion Energy Brayton Point, LLC v. Johnson, 443 F.3d 12, 17 (1st Cir.2006) (“The short of it is that the Seacoast court, faced with an opaque statute, settled upon what it sensibly thought was the best construction of the Clean Water Act’s ‘public hearing’ language.”); Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 503 (3d Cir.2008) (explaining that in the prior case “we struggled to divine their applicability to the instant fact pattern. ... [and] repeatedly noted the lack of clear guidance in the text or elsewhere regarding whether and to what extent re-classifications fell within the Rule’s scope”); see also Note, Implementing Brand X: What Counts as a Step One Holding?, 119 Harv. L.Rev. 1532, 1538 (2006) (discussing the possible ways to implement Brand X). In contrast to these cases, in Power Resource III we determined that the “plain text” of FERC’s Regulation allowed the PUC to limit the situations in which Qualifying Facilities can form Legally Enforceable Obligations. Thus, under Brand X, the interpretation put forward by Exelon would not be entitled to deference even if counsel had not conceded this point at oral argument.
*399 Even assuming arguendo that this prior interpretation left room for discretion, an agency is not entitled to deference when it offers up an interpretation of the Regulation that we have already said to be unambiguously foreclosed by the regulatory text. See Christensen, 529 U.S. at 588, 120 S.Ct. 1655 (“Auer deference is warranted only when the language of the regulation is ambiguous.”)- This court has already determined that FERC’s Regulation unambiguously “left [it] to the states and their regulatory agencies” to “definfe] the parameters for creating a Legally Enforceable Obligation.” Power Resource III, 422 F.3d at 239. We therefore accord no deference to the interpretation in FERC’s Letter.
Contrary to the dissenting opinion’s claim, we are not substituting our own reading of the regulation for FERC’s here. Nor are we deferring “based on nothing more than the state regulatory authority’s say-so.” Dissent at 401. Instead, we are deferring to the PUC’s official interpretation of the Regulation in a promulgated state regulation because our precedent requires us to defer to the PUC on this particular issue, and prevents us from deferring to Exelon’s proffered interpretation. Like FERC, the PUC too has a great deal of expertise. Indeed, Texas is rather unique in that it runs its own electric grid. Even if that were not the case, Congress delegated the authority to make this call to the PUC.
C.
The reading advocated by Exelon would also render PURPA subsection (d)(1) superfluous.[17] Subsection (d)(1) of FERC’s Regulation allows a Qualifying Facility to provide power to the utility only on an as-available basis, and requires the Qualifying Facility to price the power at the moment of delivery. Id. § 292.304(d)(1). Subsection (d)(2) gives a Qualifying Facility this exact same option to sell power to the utility on an as-available basis, and also provides a Qualifying Facility with a second option to choose to fix the price “at the time the obligation is incurred.”
Under the reading advocated by Exelon and adopted by the district court, every Qualifying Facility must have the option to form a Legally Enforceable Obligation, and thus to select between the two pricing options available under subsection (d)(2). If every Qualifying Facility may take advantage of the choice provided by subsection (d)(2), it is hard to understand why Congress or FERC would also include a separate subsection limiting Qualifying Facilities to one pricing option. Exelon’s “reading is thus at odds with one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.” Corley v. United States, 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) (internal quotation marks and brackets omitted). When presented with two plausible readings of a regulatory text, this court common-sensi-cally follows the same principle and prefers the reading that does not render portions of that text superfluous. See Nat’l Ass’n of Home Builders, 551 U.S. at 668, 127 S.Ct. 2518 (“But this reading would render the regulation entirely superflu *400 ous.”); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) (“If possible, every word and every provision is to be given effect (verba cum ejfectu sunt acci-pienda). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.” (footnote omitted)).
In contrast, the PUC’s reading of the provisions gives effect to both subsections: Only if a Qualifying Facility can guarantee a particular quantity of power at a particular time can it take advantage of the additional pricing option under subsection (d)(2). Occidental notes that this reading also supports the congressional intent that rates under PURPA “shall be just and reasonable to the electric consumers of the electric utility and in the public interest.” 16 U.S.C. § 824a-3(a)(2), (b)(1). According to Occidental, a Legally Enforceable Obligation requires a utility to purchase power at rates set potentially years in advance, and as a result, the utility needs to know that the promised power actually will be produced and readily available. Otherwise, the utility would be unable to determine how much additional power it must arrange to purchase to meet its requirements without paying a premium for last-minute purchases. Because only firm power Qualifying Facilities can provide that kind of certainty, it makes sense that only they should be able to select between the rate options.[18]
D.
In sum, Exelon has failed to show that PURPA and FERC’s Regulation mandate that all Qualifying Facilities be able to create Legally Enforceable Obligations at any time. Power Resource III, 422 F.3d at 238. PURPA allows states discretion in determining when a Legally Enforceable Obligation is created, and PUC Rule 25.242 falls within that discretion. See id. at 239. The PUC is therefore entitled to deference in defining the parameters for creating Legally Enforceable Obligations. Id. at 236. Here, the PUC has reasonably distinguished between Qualifying Facilities that can, and cannot, provide firm power. As Occidental notes, mandatory long-term contracts between generators and utilities can burden customers by imposing prices well above the actual market prices. The PUC made a reasonable decision that only those Qualifying Facilities capable of providing reliable and predictable power may enter into such arrangements. Thus, Exe-lon has not proven that the PUC failed to implement FERC’s PURPA regulations.
IV.
We VACATE the portion of the judgment regarding Exelon’s challenge to the PUC Order and direct the district court to dismiss for want of subject matter jurisdiction. As to the remaining claims, we REVERSE and REMAND for proceedings consistent with this decision.

. Power Resource Group filed one action under PURPA in Texas state court, and one in federal district court. Power Resource Group subsequently appealed the federal district court decision. Each of these actions is relevant to our discussion in this case. In order to avoid confusion, we refer to the state court decision as Power Resource I, the district court decision as Power Resource II, and the subsequent decision by this court on appeal as Power Resource III.

. The PTJC was created in 1975 when the Texas Legislature enacted the Public Utility Regulatory Act (PURA). The PUC regulates the state’s electric and telecommunication utilities, implements respective legislation, and offers customer assistance in resolving consumer complaints.

. A number of commentators have noted that the intermittent nature of wind supply remains one of the major obstacles to producing wind-generated power. As one report explained:
Wind generation has technical characteristics which inherently differ from those of conventional generation facilities. Conventional generation can be controlled, or 'dispatched' to a precise output level. The primary energy source for wind generation, however, is inherently variable and incompletely predictable. Thus, electrical output of wind generation plants cannot be dispatched.
Drew Thornley, Texas Wind Energy: Past, Present, and Future, 4 Envt’l. & Energy L. & Pol’y J. 69, 76-77 (2009) (quoting Gen. Elect. Energy, Analysis of Wind Generation Impact on ERCOT Ancillary Requirements 7 (2008)); see also John Shelton, Who, What, How, & Wind: The Texas Energy Market's Future Relationship with Wind Energy and Whether It Will Be Enough to Meet the State’s Needs, 11 Tex. Tech Admin. L.J. 401, 408-09 (2010) (explaining that “the wind blows intermittently, and therefore the wind delivers energy intermittently as well"); Governor's Competitiveness Council, 2008 Texas State Energy Plan 16, 28 (2008) (same); Thornley, supra at 76 ("Largely because of its intermittent nature, wind is not a baseload resource; thus, it cannot meet a large portion of energy demand.”).

. The PUC has three commissioners who make final determinations on the PUC’s rules and orders. Before the commissioners hear a dispute, it may first be heard by an administrative law judge. The commission retains the power to alter the administrative law judge’s findings of fact or conclusions of law before issuing an order. See Tex. Gov’t Code Ann. § 2003.049(g).

. FERC’s Letter states that FERC's Regulation
does not contain the words “firm” or “non-firm”. ... This is contrary to the language of the regulation which provides that "[e]ach qualifying facility shall have the option either: to choose the section 292.304(d)(1) method of sale, or the section 292.304(d)(2) method of sale;”
In conclusion, we find that the Texas Commission’s order, limiting the award of a legally enforceable obligation to only those Qualifying Facilities that provide "firm” power, is inconsistent with our regulations implementing PURPA. Under our regulations, [Exelon] Wind has the right to choose to sell pursuant to a legally enforceable obligation, and, in turn, has the right to choose to have rates calculated at avoided costs calculated at the time that obligation is incurred.
JD Wind 1, LLC, 129 FERC 61,148 (Nov. 19, 2009).

. PURPA’s " 'multi-layered' enforcement provisions” give federal courts exclusive jurisdiction over challenges to a state’s implementation of PURPA if two conditions are met: (1) the party bringing the claim must first petition FERC to bring an enforcement action, and (2) after FERC declines to bring such an action, the party may file a complaint which challenges the state regulations as an illegal implementation of PURPA and the FERC regulations. Power Resource III, 422 F.3d at 234-35; see also 16 U.S.C. § 824a-3(h)(2)(A)-(B). There is no dispute that the first condition is met here. Exelon petitioned FERC and FERC declined to initiate an enforcement action, although FERC did issue a declaratory order.

. This result is supported by other courts that have had occasion to interpret PURPA’s jurisdictional grant. See Occidental Chem. Corp. v. La. Pub. Serv. Comm'n, 494 F.Supp.2d 401, 411 (M.D.La.2007) (applying the reasoning from the federal district court in Power Resource II); Mass. Inst. of Tech. v. Mass. Dep’t of Pub. Utils., 941 F.Supp. 233, 238 (D.Mass.1996); Greensboro Lumber Co. v. Ga. Power Co., 643 F.Supp. 1345, 1374 (N.D.Ga.1986), aff'd, 844 F.2d 1538 (11th Cir.1988).

. Discussion between the PUC Commissioners on the record of the hearing confirms that the PUC Order had a limited scope:
CHAIRMAN SMITHERMAN: Well, I think the problem here is that there's no definition of "not readily available power.” So that sort of leads us into a confusing state.
COMM. NELSON: I think we just want to clarify it so that in the future, if somebody came in and could meet that standard that we're not being preclusive.
COMM. ANDERSON: Because I could envision in the future wind, for a variety of reasons, could be readily available whether through storage or geographical diversity or mixed with solar.
COMM. NELSON: Right. And it really depends on the area of the state—
COMM. ANDERSON: It really does.
COMM. NELSON: — because, you know, along the coast the pattern is totally different and it blows at peak times.

. The PUC promulgated a predecessor to PUC Rule 25.242 in 1981. There have been several intermediate iterations of the Rule since then, none of which impact the outcome of this case. See Act of Apr. 10, 1981, 67th Leg., R.S., ch. 31, § 2, 1981 Tex. Gen. Laws 70, 71 (codified at Tex. Utils. Code Ann. § 35.061).

. The Supreme Court’s decision in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., requires courts to conduct a two-step inquiry when determining whether to defer to an agency’s interpretation of a statute that it administers. 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under the first step, we ask “whether Congress has directly spoken to the precise question at issue” or whether the statute is ambiguous. Id. at 842-43, 104 S.Ct. 2778. If Congress has resolved the question, then the clear intent of Congress binds both the agency and the court. Id. Under the second step, if "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency’s answer is based on a permissible construction of the statute.” Id. at 843, 104 S.Ct. 2778. Under this second step, we defer to the agency’s interpretation if “it is a reasonable interpretation of the statute.” Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208, 218, 129 S.Ct. 1498, 173 L.Ed.2d 369 (2009).

. Appellants argue that we should read FERC's Regulation narrowly to avoid Tenth Amendment issues that might arise from forcing Texas to implement certain regulations. As noted in Section Il.C.ii, supra, this narrow interpretation is not necessary to avoid Tenth Amendment issues here. Texas opted to have the PUC issue rules to enforce PURPA, rather than simply opening its courts to hear PURPA disputes. Having done so, Texas (and the PUC) may not pass regulations that are inconsistent with FERC’s regulations. See Fid. Fed. Sav. & Loan Ass’n v. de la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) ("Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law.”). Cf. New York, 505 U.S. at 166-67, 112 S.Ct. 2408; Nat'l Collegiate Athletic Ass’n v. Governor of N.J., 730 F.3d 208, 228 (3d Cir.2013), cert. denied, 2014 U.S. LEXIS 4343, and cert. denied, 2014 U.S. LEXIS 4345, and cert. denied, 2014 U.S. LEXIS 4346 (June 23, 2014).

. The PUC’s regulations provide the following definitions: (5) Firm power — From a qualifying facility, power or power-producing capacity that is available pursuant to a legally enforceable obligation for scheduled availability over a specified term.
(9) Non-firm power from a qualifying facility — Power provided under an arrangement that does not guarantee scheduled availability, but instead provides for delivery as available.
16 Tex. Admin. Code § 25.242(c)(5), (9).

. Nor did our holding in Power Resource III depend, as the dissenting opinion suggests, on the fact that a state regulatory agency is entitled to deference only when FERC is silent on the issue. Rather, it was based on a recognition of the careful balance of authority between the federal and state authority that Congress drew when it implemented PURPA. The dissenting opinion’s contrary interpretation would undermine this balance by giving FERC the final say over decisions delegated to state regulatory agencies. Such a shift in power might raise the sort of “troublesome” Tenth Amendment concerns expressed by the Supreme Court in FERC v. Mississippi, 456 U.S. at 759, 102 S.Ct. 2126. The dissenting opinion does not address the serious constitutional concerns that could flow from its approach, and we are hesitant to wade unnecessarily into such murky waters. We therefore reject the dissenting opinion’s interpretation of Power Resource III.

. In Auer the Supreme Court applied the same two-step analysis from Chevron and explained that agency interpretations of their own regulations are entitled to even greater deference. 519 U.S. at 457, 117 S.Ct. 905.

. The dissenting opinion argues that even though Exelon conceded that FERC's Letter advocating this interpretation was not entitled to deference under Chevron and Auer, we should still defer. In support of this conclusion, the dissenting opinion relies on a dissent from an en banc opinion of this court, Castellanos-Contreras v. Decatur Hotels, LLC, 622 F.3d 393, 397 (5th Cir.2010) (en banc), and our decision in Elgin Nursing & Rehabilitation Center v. U.S. Dep’t of Health & Human Servs., 718 F.3d 488, 492 (5th Cir.2013). A dissenting opinion is, of course, not binding. Elgin did not address the issue of whether a party may concede that an interpretation is not entitled to deference. Instead, the court in Elgin gave an interpretation the proper level of deference when the two parties disagreed on the appropriate level of deference. 718 F.3d at 492. We therefore see no reason why we should not accept Exelon’s concession here.

.While the Supreme Court’s decision in Brand X specifically addressed Chevron deference, our sister circuits have applied this same framework when interpreting regulations. See, e.g., Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 502 (3d Cir.2008) ("We see no reason why these principles should not apply equally to the interpretation of a regulation.”).

. Here, Exelon has not given an adequate explanation for what independent role (d)(1) could play under its interpretation of the Regulation. Only the dissenting opinion offers some explanation of what role (d)(1) might serve under Exelon’s interpretation. We cannot determine that a provision is not rendered superfluous by a party’s reading simply because there may be some theoretical situation, not identified or even articulated by either party, that would give it effect.

. Indeed, as Occidental notes, the PUC is far from alone in requiring a Qualifying Facility to deliver firm power in order to form a Legally Enforceable Obligation. According to Occidental, seven other states place similar requirements on Qualifying Facilities.