# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-60543

United States Court of Appeals
Fifth Circuit

**FILED**

November 26, 2018

Lyle W. Cayce
Clerk

R. ALEXANDER ACOSTA, Secretary, Department of Labor,

Petitioner,

v.

HENSEL PHELPS CONSTRUCTION COMPANY,

Respondent.

On Petition for Review of a Final Order of the
Occupational Safety and Health Review Commission

Before GRAVES and COSTA, Circuit Judges, and BENNETT, District Judge.**\***
JAMES E. GRAVES, JR., Circuit Judge:

Thirty-seven years ago, this court, in a tort case, announced that "OSHA regulations protect only an employer's own employees." *Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706, 711 (5th Cir. Unit A Oct. 1981). That decision has endured despite the seismic shift brought about by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and the decades of administrative-law aftershocks that followed.

Today we reexamine *Melerine*, and the precedent on which it relies,[1] in

---

**\*** District Judge of the Southern District of Texas, sitting by designation.

[1] *Se. Contractors, Inc. v. Dunlop*, 512 F.2d 675 (5th Cir. 1975) (per curiam); *Horn v. C.L. Osborn Contracting Co.*, 591 F.2d 318, 321 (5th Cir. 1979); *Barrera v. E.I. DuPont de Nemours & Co.*, 653 F.2d 915 (5th Cir. Unit A Aug. 1981).

the light of that shift. In this appeal, the Secretary of Labor asks the court to decide whether he has the authority—under either the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.* (the Act), or Occupational Safety and Health Administration (OSHA) regulations—to issue a citation to a general contractor at a multi-employer construction worksite who controls a hazardous condition at that worksite, even if the condition affects another employer's employees. We conclude that he does have that authority under the Act.

## I

The parties have stipulated to the relevant factual and procedural history in this action. In 2010, Respondent Hensel Phelps Construction Company entered into a contract with the City of Austin to build a new public library. Hensel Phelps, as general contractor, maintained control over the worksite through the presence of on-site management personnel, including superintendents, project engineers, and project managers. In 2014, Hensel Phelps contracted with subcontractor Haynes Eaglin Watters, LLC (HEW), to do certain work on the project's Seaholm Substation East Screen Wall. Later that year, HEW contracted with sub-subcontractor CVI Development, LLC, to complete demolition, excavation, and other work as required for the East Screen Wall.

As the excavation at the worksite progressed, a nearly vertical wall of "Type C" soil[2] was allowed to develop, measuring approximately 12 feet in height and 150 feet in length. OSHA regulations mandate that excavations in this type of soil use protective systems, such as sloping, to protect employees from cave-ins. *See* 29 C.F.R. §§ 1926.652(a)(1) & (b). No such protective systems were put in place at this excavation.

---

[2] So-called "Type C" soil is the least stable type under OSHA's soil classification system. Type C soil includes gravel, sand, soil from which water is freely seeping, and other unstable soils. *See* 29 C.F.R. part 1926, subpart P, appendix A.

On the rainy morning of March 4, 2015, CVI was assigned to reinstall reinforcing rods ("rebar") at the base of this excavated wall of soil, preliminary to pouring concrete footings. The wall was not properly sloped or otherwise protected from cave-in hazards, and had not been for several days. Concerned about the combination of the weather and the instability of the excavation wall, CVI owner Karl Daniels sent his employees to work on another area of the site while he awaited instructions from HEW or Hensel Phelps on how to proceed at the excavation area. A City of Austin inspector saw the CVI employees working at the other location and told Daniels that his employees should work only at the excavation. The inspector also reported to Hensel Phelps' area superintendent that CVI employees were working at the other location. The superintendent instructed Daniels to have his employees return to the excavation and not to do any other work until the excavation work was completed. Daniels sent an email to HEW's senior project manager, stating that "[P]lacing rebar in the mud and rain is unorthodox and very dangerous." The project manager gave only a cursory reply that CVI should comply with its instructions. Daniels thereafter removed his employees from the other work area and sent them back to the excavation area to install rebar.

That same day, the OSHA Area Office in Austin received a complaint of hazardous working conditions at the library project excavation area. A compliance officer conducted an inspection of the site and discovered three CVI employees working at the base of the unprotected wall of excavated soil. The city inspector, Hensel Phelps' superintendent, and both Hensel Phelps' and HEW's project superintendents were present at the wall, as well, with full views of the CVI employees working there.

OSHA cited both CVI and Hensel Phelps for willfully violating 29 C.F.R.

§ 1926.652(a)(1)[3] by exposing employees to a cave-in hazard from an unprotected excavation at a construction site.[4] *Hensel Phelps Constr. Co.*, 26 BNA OSHC 1773, at *4 (No. 15-1638, 2017) ("ALJ Decision"). OSHA issued its citation against Hensel Phelps pursuant to its multi-employer citation policy. Under this policy, an employer who causes a hazardous condition (a "creating employer") or a general contractor or other employer having control over a worksite who should have detected and prevented a violation through the reasonable exercise of its supervisory authority (a "controlling employer") may be cited for a violation, whether or not its own employees were exposed to the hazard. *See generally* Occupational Safety & Health Admin., CPL 02-00-124, Multi-Employer Citation Policy (1999); *see also* Occupational Safety & Health Admin., CPL 02-00-160, Field Operations Manual 4-5 (2016). OSHA considered Hensel Phelps a "controlling employer" because the company had "general supervisory authority over the worksite, including the power to correct safety and health violations itself or require others to correct them." ALJ Decision at *5–6.

Hensel Phelps timely contested the citation. In the proceedings before the Occupational Safety and Health Review Commission ALJ, the parties stipulated that (1) the excavation was not adequately protected; (2) Hensel Phelps knew that the excavation was not adequately protected because its supervisors observed CVI employees working next to the unprotected excavation; (3) and Hensel Phelps had management authority over the entire library project and had the specific authority to prevent the violation by correcting the hazardous conditions or by stopping CVI's employees from working in the area. The ALJ determined that Hensel Phelps met the requirements to be considered a "controlling

---

[3] The regulation provides: "Each employee in an excavation shall be protected from cave-ins by an adequate protective system . . . except when: (i) Excavations are made entirely in stable rock; or (ii) Excavations are less than 5 feet (1.52m) in depth and examination of the ground by a competent person provides no indication of a potential cave-in." 29 C.F.R. § 1926.652(a)(1).

[4] CVI later settled with OSHA; OSHA's citation of CVI is not at issue here.

employer" who has a duty under the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*, to act reasonably to prevent or detect and abate violations at the worksite even when the affected employees are those of another employer. Under Commission precedent, the stipulated facts dictated a finding that Hensel Phelps violated 29 C.F.R. § 1926.652(a)(1). ALJ Decision at *6.

But this finding was not the end of the matter, for "[w]here it is highly probable that a Commission decision would be appealed to a particular circuit, the Commission [] generally applie[s] the precedent of that circuit in deciding the case—even if it may differ from the Commission's precedent." *Kerns Bros. Tree Serv.*, 18 BNA OSHC 2064 (No. 96-1719, 2000); *see also Smith Steel Casing Co. v. Donovan*, 725 F.2d 1032, 1035 (5th Cir. 1984) ("A holding by a court of appeals on a legal question is binding on the [] Commission in all cases arising within that circuit until and unless the court of appeals or the Supreme Court overturns that holding . . . ."). Because this citation arose within the jurisdiction of the Fifth Circuit, the ALJ found that Fifth Circuit precedent foreclosed the citation. ALJ Decision at *6. Specifically citing *Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706, 711 (5th Cir. Unit A Oct. 1981), which stated that "OSHA regulations protect only an employer's own employees," the ALJ concluded that an employer at a worksite within the Fifth Circuit cannot be held in violation of the Act when the employees exposed to the hazard were employees of a different employer. ALJ Decision at *6–7. The ALJ vacated the citation.

The Secretary sought discretionary review of the ALJ's decision. The Commission did not grant it, so the decision became a final order of the Commission. *See* 29 C.F.R. § 2200.90(b). The Secretary timely filed a petition for review in this court.

## II

Because the ALJ's decision became a final order of the Commission, we review that decision on appeal. *W.G. Yates & Sons Constr. Co. v. Occupational*

*Safety & Health Review Comm'n*, 459 F.3d 604, 606 (5th Cir. 2006). The issues the Secretary raises are purely issues of law, and the court reviews the Commission's legal conclusions "for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Aus. Indus. Specialty Servs., L.P. v. Occupational Safety & Health Review Comm'n*, 765 F.3d 434, 438–39 (5th Cir. 2014) (per curiam) (quoting *Trinity Marine Nashville, Inc. v. Occupational Safety & Health Review Comm'n*, 275 F.3d 423, 427 (5th Cir. 2001)).

## III

A court reviewing an agency's interpretation of its authority under the statute it administers must engage with the two-step framework established in *Chevron. See W. Ref. Sw., Inc. v. FERC*, 636 F.3d 719, 723 (5th Cir. 2011). At the first step, "applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron*, 467 U.S. at 842–43).[5] "But if the statute is silent or ambiguous with respect to the specific issue, the question for the court" at the second step "is whether the agency's answer is based on a permissible construction of the statute." *Id.* (internal quotation marks omitted) (quoting *Chevron*, 467 U.S. at 843). If both criteria are met, that is, "[i]f a statute is ambiguous, and if the implementing agency's construction is reasonable," then "*Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Human Servs.*, 718 F.3d 488, 492 n.3 (5th

---

[5] The "ordinary tools of statutory construction" include "text, structure, purpose, and legislative history." *BNSF Ry. Co. v. United States*, 775 F.3d 743, 751 (5th Cir. 2015) (quoting *Citizens Coal Council v. Norton*, 330 F.3d 478, 481 (D.C. Cir. 2003)).

Cir. 2013) (citation omitted); *see also City of Arlington*, 569 U.S. at 297 ("No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, ***whether the agency has stayed within the bounds of its statutory authority***." (emphasis in original)); *BNSF Ry. Co. v. United States*, 775 F.3d 743, 751 (5th Cir. 2015) ("[W]e do not . . . impose [our] own construction on the statute." (quoting *Chevron*, 467 U.S. at 843)). We will likewise defer to an agency's reasonable interpretation of its own regulations when the text of the regulation is ambiguous. *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 152 (1991); *Delek Ref., Ltd. v. Occupational Safety & Health Review Comm'n*, 845 F.3d 170, 175 (5th Cir. 2016).

It is undisputed that none of Hensel Phelps' employees were exposed to the excavation wall hazard. Despite this, the Secretary maintains that he has the authority under both the Act and the implementing regulations to issue citations to controlling employers, like Hensel Phelps, at multi-employer worksites. It is also undisputed that the Secretary's position is contrary to this court's decision in *Melerine*, in which we reaffirmed precedent finding both the Act and OSHA regulations protect only an employer's own employees. 659 F.2d at 710–12 (citing *Se. Contractors, Inc. v. Dunlop*, 512 F.2d 675 (5th Cir. 1975) (per curiam), *Horn v. C.L. Osborn Contracting Co.*, 591 F.2d 318, 321 (5th Cir. 1979), and *Barrera v. E.I. DuPont de Nemours & Co.*, 653 F.2d 915 (5th Cir. Unit A Aug. 1981)).

That said, *Melerine* and the cases it relies on all predate *Chevron*. In such a situation—where an appellate court's pre-*Chevron* statutory interpretation is at odds with the *Chevron* deference possibly due an administrative agency's subsequent interpretation—we turn to the Supreme Court's holding in *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005), that "[a] court's prior judicial construction of a statute trumps an agency

construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982. Striving to avoid the "anomalous results" that would flow from a rule that would give preference to whichever interpretation was first in time, the Court in *Brand X* decided that "[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting statutory construction." *Id.* at 982–83.

"*Brand X* demands that we reexamine pre-*Chevron* precedents through a *Chevron* lens." *Dominion Energy Brayton Point, LLC v. Johnson,* 443 F.3d 12, 17 (1st Cir. 2006). Thus, to resolve the issues in this appeal, our analysis proceeds by answering the following four questions. ***First,*** is the Secretary's interpretation of the Act "otherwise entitled to *Chevron* deference"? *Brand X*, 545 U.S. at 982. In other words, if we were looking at this issue for the first time, post-*Chevron*, and assuming *Melerine* and its underlying cases never existed, would the Secretary's interpretation be entitled to deference? *See id.* (directing courts undertaking this analysis to "review[] the agency's construction on a blank slate"). ***Second,*** if yes, did *Melerine* and the underlying cases hold that their interpretation of the Act "follow[ed] from the unambiguous terms of the statute and thus leave[] no room for agency discretion"? *Id.* ***Third,*** if no, should the court rule that *Melerine* and the underlying cases must no longer be followed? And ***fourth,*** if yes, free from the confines of *Melerine* and its forebears, is the ALJ's decision vacating the citation arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law?[6]

---

[6] If the answer to this final question is no, the court may undergo the analysis again, this time using the Secretary's interpretation of his authority under the implementing regulations, for this Circuit similarly applies *Brand X* to the court's pre-*Chevron* interpretation of a federal regulation. *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 397 & n.16 (5th Cir. 2014).

## A

The Secretary argues that two particular sections of the Act grant him authority to cite controlling employers at multi-employer worksites: 29 U.S.C. §§ 654(a)(2) and 652(8). Section 654(a) provides as follows:

(a)   Each employer—

    (1)   shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

    (2)   shall comply with ***occupational safety and health standards*** promulgated under this chapter.

29 U.S.C. § 654(a) (emphasis added). "Occupational safety and health standard" is a defined term in § 652(8), defined as a standard that requires the taking of some action "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." *Id.* § 652(8). The Secretary construes § 654(a)(1) and (2) as imposing two different duties, with subsection (a)(1) creating a general duty that runs to an employer's own employees (and only his own employees), and with subsection (a)(2) requiring employers to, more broadly, comply with the Act's safety standards. Hensel Phelps contends that the language of § 654(a) cannot reasonably be read as granting the Secretary authority to impose liability outside the employer-employee relationship. It is in this disagreement that a *Chevron* question arises.

## 1

At *Chevron* step one, we ask whether Congress, through § 654(a), has directly spoken to this issue, *i.e.*, has Congress affirmatively limited (or affirmatively refused to limit) the Secretary's authority to cite employers to only hazards that affect his own employees? "[A] reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in

context." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). Our inquiry must be guided by the underlying principle that "safety legislation," like the Act, "is to be liberally construed to effectuate the congressional purpose." *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 13 (1980).

Even a cursory glance at the plain language of § 654(a) demonstrates that subsection (a)(1) contains the limiting language "to each of his employees," but subsection (a)(2) does not. "Absent persuasive indications to the contrary, we presume Congress says what it means and means what it says," *Simmons v. Himmelreich*, 578 U.S. —, —, 136 S. Ct. 1843, 1848 (2016), and "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion," *Russello v. United States*, 464 U.S. 16, 23 (1983). We can surmise, then, that Congress perhaps intended to include the limiting language in subsection (a)(1) and, by excluding that language from subsection (a)(2), perhaps left open the possibility that an employer could be cited for a violation at a worksite he controls but that is also populated by employees of various other employers. *See Universal Constr. Co. v. Occupational Safety & Health Review Comm'n*, 182 F.3d 726, 728 (10th Cir. 1999) (indicating that the duty in subsection (a)(2) "does not limit its compliance directive to the employer's own employees, but requires employers to implement the Act's safety standards for the benefit of all employees in a given workplace, even employees of another employer.").

This reading is bolstered by combining the text of § 654(a)(2) with § 652(8)'s definition of "occupational safety and health standard," as together they require an employer to take action to provide safe or healthful "employment" ***and*** "places of employment." The Supreme Court has "cautioned against reading a [statutory] text in a way that makes part of it redundant." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007). With this in mind, we find that

"employment" and "places of employment" must refer to two different concepts for both terms to carry independent meaning. The term "places of employment" may limit the employer's duty to worksites where he has employees, but it cannot be "limited to only the 'employment' of his employees because that interpretation would render the phrase 'places of employment' redundant of 'employment' and, therefore, superfluous." *Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 828 (8th Cir. 2009).

For Hensel Phelps to successfully pretermit the analysis at *Chevron* step one, it must show that the language of § 654(a)(2) plainly permits citation of only those employers who expose their own employees to hazards. It has a tough row to hoe, for its view of § 654(a)(2) is contrary to the view of every circuit court that has espoused one: each of those seven courts has held either that § 654(a)(2) unambiguously stands for the ***opposite*** of what Hensel Phelps argues—*i.e.*, that the statute unambiguously accords with the Secretary's interpretation—or that the statute is at least ambiguous on the issue. *See Universal Constr. Co.*, 182 F.3d at 729 ("While broad, the language of § 654(a)(2) is ambiguous and does not clearly compel the conclusion that Congress did or did not intend to permit the Secretary to impose liability for hazards that an employer controlled but did not create and which did not threaten the employer's employees."); *United States v. Pitt-Des Moines, Inc.*, 168 F.3d 976, 983 (7th Cir. 1999) ("The use of the words 'his employees' in describing the duties of Section 654(a)(1) and the conspicuous absence of any limiting language in Section 654(a)(2) certainly indicate that a broader class was meant to be protected by the latter. . . . There is no reason to conclude that the specific protection Section 654(a)(2) affords—freedom from safety violations—is limited to an employer's own employees. This is particularly true when employees of different employers work in close proximity and all are subject to the risk those violations create."); *Teal v. E.I. DuPont de Nemours & Co.*, 728 F.2d 799, 804–05 (6th Cir. 1984) ("We believe that Congress enacted

Sec. 654(a)(2) for the special benefit of *all* employees, including the employees of an independent contractor, who perform work at another employer's workplace."); *Marshall v. Knutson Constr. Co.*, 566 F.2d 596, 599 (8th Cir. 1977) (adopting interpretation of § 654(a)(2) that "the duty of a general contractor is not limited to the protection of its own employees from safety hazards, but extends to the protection of all the employees engaged at the worksite"); *Brennan v. Occupational Safety & Health Review Comm'n*, 513 F.2d 1032, 1038 (2d Cir. 1975) ("[Section 654(a)(2)'s] specific duty to comply with the Secretary's standards is in no way limited to situations where a violation of a standard is linked to exposure of his employees to the hazard. It is a duty over and above his general duty to his own employees under § 654(a)(1)." (footnote omitted)); *see also Beatty Equip. Leasing, Inc. v. Sec'y of Labor*, 577 F.2d 534, 537 (9th Cir. 1978) (agreeing with and adopting Second Circuit's interpretation); *Brennan v. Gilles & Cotting, Inc.*, 504 F.2d 1255, 1261 (4th Cir. 1974) ("As we view the statutory purposes of [the Act], the question of whether a general contractor should be concurrently responsible for the safety of subcontractor workmen under the concept of a joint or statutory employer can be answered either way."), *abrogated on other grounds by Martin*, 499 U.S. 144.

Hensel Phelps argues that the controlling employer policy violates section 4(b)(4) of the Act. That provision states that "Nothing in this Act shall be construed to . . . affect . . . the common law . . . duties, or liabilities of employers." 29 U.S.C. § 653(b)(4). Hensel Phelps believes that the Secretary's interpretation of the Act as authorizing the controlling employer policy "would force general contractors to *assert* control over the activities of subcontractors," impermissibly increasing their liability. When confronted with this same argument the D.C. Circuit ruled that citation to § 653(b)(4) is not a defense against a controlling-employer citation because any expansion of liability on the part of the contractor "would arise only from a court's (hypothetical) later action under state

law—not from the [] Act itself, which is all that § 4(b)(4) addresses." *Summit Contractors, Inc. v. Sec'y of Labor*, 442 F. App'x 570, 572 (D.C. Cir. 2011) (per curiam). We agree with this reasoning; no controlling-employer citation under § 654(a)(2) would, on its face, affect Hensel Phelps' ***common law*** duties as an employer.

We also reject Hensel Phelps' argument that the Secretary's purported authority under the Act is improperly premised on an expansive definition of "employer" and "employee," contrary to the Supreme Court's holding in *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 322–24 (1992), that Congress intends the term "employee" to connote a traditional common-law master-servant relationship if a statute does not set forth a different definition. The Eighth Circuit previously addressed and rejected this argument. In *Summit Contractors*, that court explained that the controlling-employer citation policy does not conflict with *Darden* because § 654(a)(2), "unlike § 654(a)(1), does not base an employer's liability on the existence of an employer-employee relationship," so it cannot be premised on any definition of employer and employee, let alone expansive ones. 558 F.3d at 828; *see also Gilles & Cotting*, 504 F.2d at 1261 ("A common law definition of employer is [] unsuitable as the dispositive interpretation of the statutory term because the states differ on the proper scope of the term in various situations, and thus there is no uniform nationwide definition. As a Congressional enactment of nationwide application, [the Act] requires a single consistent definition of 'employer' throughout the country so that there will be uniform application of this national legislation in all states." (citation omitted)). The Eighth Circuit's treatment of this argument seems to be the correct one. Section 654(a)(2) can be read as a reflection of Congress's intent to position the importance of maintaining safe workplaces over and above any employer-employee relationships that exist within those workplaces. To effectuate that intent, Congress may have omitted the words "employer" and "employee"

from § 654(a)(2) to preemptively disentangle it from any potential thorny issues regarding what might be considered an "employer" and an "employee" in different contexts in different states.

At bottom, even assuming that § 654(a)(2) is susceptible to Hensel Phelps' interpretation, we are not convinced that the statute is not also susceptible to the Secretary's interpretation. In our view, the intent of Congress underlying this statute is at least ambiguous. The Tenth Circuit's discussion in *Universal Construction Co.* perfectly encapsulates the ambiguity:

> It may be . . . that (a)(2) was intended to create a specific duty requiring an employer to comply with OSHA safety standards for the good of all employees—even those employed by others—at a common worksite. If so, however, it is plausible that Congress would have chosen more direct phrasing to implement such a scheme. . . . Subsection (2) on its face does not limit an employer's duty to comply with safety standards only to the employer's employees. Nor is there any patently compelling reason to assume merely because liability under (a)(1) is limited to situations where an employer's own employees are exposed to hazards, liability under (a)(2) is likewise limited. . . . Given the ambiguities of the statute, we are not prepared to conclude the plain language of the statute alone or its nonexistent legislative history on this issue permits us to accept or reject the multi-employer doctrine.

182 F.3d at 729. Consistent with this reading, we find that Congress's intent in promulgating § 654(a)(2) is ambiguous on the issue of the Secretary's authority to issue citations to controlling employers at multi-employer worksites, thereby opening the door to *Chevron* step two.

**2**

At step two, "*Chevron* directs courts to accept an agency's reasonable resolution of an ambiguity in a statute that the agency administers." *Michigan v. EPA*, 576 U.S. —, —, 135 S. Ct. 2699, 2707 (2015). "The agency's view 'governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed ***most*** reasonable by the

courts,'" *Coastal Conserv'n Ass'n v. U.S. Dep't of Commerce*, 846 F.3d 99, 106 (5th Cir. 2017) (quoting *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009)), provided that the interpretation is not "arbitrary, capricious, or manifestly contrary to the statute," *EPA v. EME Homer City Generation, L.P.*, 572 U.S. —, —, 134 S. Ct. 1584, 1603 (2014) (quoting *Chevron*, 467 U.S. at 844). *See also Chevron*, 467 U.S. at 843 n.11 ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."). "[T]he whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency," *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996), so "[i]f the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld," *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 587 (5th Cir. 2016) (quoting *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998)).

The Secretary's interpretation of § 654(a)(2) as permitting him to cite a controlling employer at a multi-employer worksite conforms to those minimal standards of rationality and is well within the bounds of permissible interpretation. The interpretation makes practical sense. In a place of employment like a construction worksite, populated by subcontractors, sub-subcontractors, and their employees performing various (and often overlapping) tasks, only the general contractor maintains supervisory authority over—and has access to—the entire space. If a general contractor enjoys the benefits of project supervision, it follows that he should also bear the burdens, by being held to comply—and to direct its subcontractors to comply—with the Act's safety standards. *See Universal Constr. Co.*, 182 F.3d at 730.[7] The Secretary has consistently held this

---

[7] The Commission further elucidates this justification:

No. 17-60543

interpretation for decades, relying on the authority he maintains has been granted to him by § 654(a)(2) to cite employers on multi-employer construction sites for hazardous conditions they created or controlled, regardless of whether their own employees were exposed. *See Anning-Johnson Co.*, 4 BNA OSHC 1193, 1199 (Nos. 3694 & 4409, 1976) (first adopting the Secretary's interpretation); *see also, e.g.*, *McDevitt Street Bovis Inc.*, 19 BNA OSHC 1108 (No. 97-1918, 2000); *Blount Int'l Ltd.*, 15 BNA OSHC 1897 (No. 89-1394, 1992); *Red Lobster Inns of Am., Inc.*, 8 BNA OSHC 1762 (No. 76-4754, 1980). Indeed, the Secretary even interpreted the statute in this way during the period of time when the Commission held the opposing interpretation. *See Martin Iron Works, Inc.*, 2 BNA OSHC 1063 (No. 606, 1974); *Gilles & Cotting, Inc.*, 1 BNA OSHC 1388 (No. 504, 1973), *vacated sub nom. Brennan v. Gilles & Cotting, Inc.*, 504 F.2d 1255. The consistency of the Secretary's interpretation over time reinforces a finding of reasonableness. *Compare Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 381 (5th Cir. 2018) (explaining that, in the reasonableness calculus, "persuasive weight"

---

Typically, a construction job will find a number of contractors and subcontractors on the worksite, whose employees mingle throughout the site while work is in progress. In this situation, a hazard created by one employer can foreseeably affect the safety of employees of other employers on the site. Conversely, as a practical matter it is impossible for a particular employer to anticipate all the hazards which others may create as the work progresses, or to constantly inspect the entire jobsite to detect violations created by others. Indeed, . . . it would be unduly burdensome to require particular crafts to correct violations for which they have no expertise and which have been created by other crafts. . . . [O]n a construction site, the safety of all employees can best be achieved if each employer is responsible for assuring that its own conduct does not create hazards to any employees on the site, and that imposing liability on this basis would not place an unreasonable or unachievable duty on contractors. . . .

Additionally, the general contractor normally has responsibility to assure that the other contractors fulfill their obligations with respect to employee safety which affect the entire site. The general contractor is well situated to obtain abatement of hazards, either through its own resources or through its supervisory role with respect to other contractors. It is therefore reasonable to expect the general contractor to assure compliance with the standards insofar as all employees on the site are affected. Thus, we will hold the general contractor responsible for violations it could reasonably have been expected to prevent or abate by reason of its supervisory capacity.

*Grossman Steel & Aluminum Corp.*, 4 BNA OSHC 1185 (No. 12775, 1976).

16

is due an agency's "contemporaneous construction of applicable law and subsequent consistent interpretation" (citing *Watt v. Alaska*, 451 U.S. 259, 272–73 (1981))), *with Util. Air Regulatory Grp. v. EPA*, 573 U.S. —, —, 134 S. Ct. 2427, 2444 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate . . . , we typically greet its announcement with a measure of skepticism.").[8]

We disagree with Hensel Phelps that anything in *United States v. Mead Corp.*, 533 U.S. 218 (2001), counsels against our finding the Secretary's interpretation of § 654(a)(2) to be reasonable. In *Mead*, the Supreme Court held that agency enforcement policies are not entitled to *Chevron* deference when they derive from sources outside notice-and-comment rulemaking or formal agency adjudication. *Id.* at 226–27. According to Hensel Phelps, OSHA's published Multi-Employer Citation Policy has never been "subjected to the rigors of administrative rulemaking or formal agency adjudication," so it should not qualify for *Chevron* deference. Hensel Phelps misses the mark. The Secretary's interpretation did not derive from any outside source. *Mead* explained that an agency's implementation of a statute qualifies for *Chevron* deference where the implementation was promulgated in the exercise of the authority delegated to it by Congress, such as by the agency's "power to engage in adjudication." *Mead*, 533 U.S. at 226–27. An agency's interpretation of its governing statute in an administrative adjudication "is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a workplace health and safety standard." *Martin*, 499 U.S. at 157. The Multi-Employer Citation Policy is an agency document that provides guidance to OSHA inspectors as to when it may be appropriate to cite a

---

[8] This is not to say that the Secretary must have interpreted the Act in this way from the date of enactment. *See La. Pub. Serv. Comm'n v. FERC*, 761 f3d 540, 554 (5th Cir. 2014) ("An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." (quoting *Chevron*, 467 U.S. at 863-64).

particular employer. Purporting to derive citation authority from the ***Policy*** would not pass muster under *Mead*, but the Secretary did not derive any authority from the Policy in citing Hensel Phelps; he relied on the statute itself and engaged in adjudication on the basis of that statutory authority. *See Summit Contractors, Inc. v. Sec'y of Labor*, 442 F. App'x 570, 571–72 (D.C. Cir. 2011) (per curiam); *see also Martin*, 499 U.S. at 157 ("[W]hen embodied in a citation, the Secretary's interpretation assumes a form expressly provided for by Congress.").

We find that the Secretary's construction of the statute as granting authority to issue citations to controlling employers is a "reasonably defensible" one. *Sara Lee Bakery Grp., Inc. v. NLRB*, 514 F.3d 422, 428 (5th Cir. 2008) (quoting *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996)). Accordingly, under *Chevron*, we must defer to it.

## B

Continuing along on our *Brand X* journey, we must next look at our previous cases—*Southeast Contractors*, *Horn*, *Barrera*, and *Melerine*—to determine the provenance of the principle that the Act protects only an employer's employees, and decide whether it "follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982. To reiterate, "[***o***]***nly*** a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." *Id.* at 982–83.

The two times[9] this court previously dealt with *Brand X*, we followed our pre-*Chevron* precedent because our prior opinions on the issue had not indicated any ambiguity in the provisions they were interpreting.

---

[9] A third case, *CenturyTel of Chatham, LLC v. Sprint Communications Co.*, 861 F.3d 566 (5th Cir. 2017), though it involved *Brand X*, is not applicable here. The court there decided to disregard two out-of-circuit district court opinions, not our own precedent.

No. 17-60543

The first case, *Silva-Trevino v. Holder*, 742 F.3d 197 (5th Cir. 2014), involved interpretation of a provision of the Immigration and Nationality Act that renders inadmissible "any alien convicted of . . . a crime involving moral turpitude." 8 U.S.C. § 1182(a)(2)(A)(i). Our prior cases had held that a judge determining whether a given conviction qualified as a crime of moral turpitude could consider only "'the inherent nature of the crime, as defined in the statute,' or, in the case of divisible statutes, 'the alien's record of conviction,'" and could not inquire into the "circumstances surrounding the particular transgression." *Silva-Trevino*, 742 F.3d at 200 (quoting *Amouzadeh v. Winfrey*, 467 F.3d 451, 455 (5th Cir. 2006)). But the Attorney General later established an approach requiring immigration judges and the Board of Immigration Appeals to "consider any additional evidence deemed necessary or appropriate to resolve accurately the moral turpitude question." *Id.* (quoting *In re Silva-Trevino*, 24 I. & N. Dec. 687 (2008)). We declined to defer to the Attorney General's construction of the statute as allowing extrinsic evidence because our precedent followed from the plain language of the statute, which we held was unambiguous.[10]

In the second case, *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380 (5th Cir. 2014), we declined to set aside our prior interpretation of a Federal Energy Regulatory Commission regulation. Previously, in *Power Resource Group, Inc. v. Public Utility Service Commission*, 422 F.3d 231, 239 (5th Cir. 2005), we had held that the "plain text" of a regulation failed to mandate whether all "Qualifying

---

[10] We explained:

> [W]e need not speculate as to what is meant by the phrase "convicted of" a crime of moral turpitude, because Congress had the foresight to tell us. The statutory definitions indicate that "conviction means, with respect to an alien, a formal judgment of guilt . . . ." The statute then includes a list of the seven official documents that may be considered as proof of such a conviction. *Id.* § 1229a(c)(3)(B). There is no mention of any additional evidence; and the introductory phrasing, "any of the following documents or records'" gives no indication that extrinsic evidence is contemplated.

*Silva-Trevino*, 742 F.3d at 200–01.

Facilities" were allowed to form "Legally Enforceable Obligations."[11] FERC later interpreted its own regulation to allow all Qualifying Facilities to form Legally Enforceable Obligations. The *Exelon Wind* plaintiff urged the court to defer to FERC's interpretation. Following a "straight-forward application" of *Brand X*, we rejected the plaintiff's argument, explaining that *Power Resource* "makes clear that our prior reading of FERC's Regulation unambiguously forecloses the interpretation offered by Exelon." *Exelon Wind*, 766 F.3d at 397.[12] We deemed our application of *Brand X* to be consistent with cases that **had** invoked it to overrule a previous judicial construction: "In those cases, the courts emphasize that their prior decisions also noted ambiguity in the text at issue." *Id.* at 398.

In both *Silva-Trevino* and *Exelon Wind*, we had previously construed the relevant statute or regulation in keeping with its plain, unambiguous text. And in both cases, we rejected an agency's subsequent interpretation that was directly at odds with our prior interpretation.

Just the opposite here: *Melerine* expressly recognized that the court decided to come down on one side of a "complex debate." What is more, *Melerine* and most of the cases predating it analyzed an OSHA regulation, not the text of the statute in which we and other circuits have found ambiguity.

In *Melerine*, the defendant had hired the plaintiff's employer as a subcontractor to perform certain work. The plaintiff was injured on the job and sued

---

[11] The meanings of these terms are not material to our discussion.

[12] The relevant text of *Power Resource* provided as follows:

> If FERC had determined it necessary to set more specific guidelines concerning [Legally Enforceable Obligations], it could have done so. For example, the FERC regulations could have mandated that the [Qualifying Facilities] must be able to lock in purchase rates with a [Legally Enforceable Obligation] prior to construction of a facility. The plain text of the FERC regulation, however, fails to mandate that requirement. Rather, defining the parameters for creating a [Legally Enforceable Obligation] is left to the states and their regulatory agencies.

*Exelon Wind*, 766 F.3d at 397–98 (alterations in original) (emphasis removed) (quoting *Power Resource*, 422 F.3d at 239).

the defendant, claiming, not unlike the plaintiff in *Horn*, that the defendant's violation of certain OSHA standards established negligence *per se*. The court began the pertinent discussion by explaining that whether the Act "regulates only the obligation of the employer to provide safe work conditions for his employees or also states a standard of care due third persons has been the subject of '**complex dispute**.'" *Melerine*, 659 F.2d at 710 (emphasis added) (quoting *Rabar v. E.I. DuPont de Nemours & Co.*, 415 A.2d 499, 503 (Del. Super. 1980), *overruled by Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992), *as recognized in Figgs v. Bellevue Holding Co.*, 652 A.2d 1084 (Del. Super. 1994)). The court then showed that this "complex dispute" had manifested itself in a split in authority:

> Some courts have held that, given the language of [the Act]'s clauses on the duties of employers, [the Act]'s broad statement of purpose, and [the Act]'s generally broad language, OSHA regulations protect not only an employer's own employees, but all employees who may be harmed by the employer's violation of the regulations. This court, however, along with others, has held that OSHA regulations protect only an employer's own employees.

*Id.* at 710–11 (footnotes omitted).[13] Looking specifically at § 654(a)(2), the court conceded that "[o]ne might argue . . . that § 654(a)(2), which lacks the limiting language 'his employees' of § 654(a)(1), establishes for the benefit of all employees, not just an employer's own employees, a specific duty to comply with OSHA regulations." *Id.* at 710 n.12. But after summarizing *Southeast Contractors*, *Horn*, and *Berrera*, the court reiterated that "[i]n this circuit, . . . the class protected by OSHA regulations comprises only employers' own employees." *Id.* at 712.

We cannot ignore the glaring reality that *Melerine* is silent on the scope

---

[13] The "others'" the court referred to were the Fourth Circuit—which in *Gilles & Cotting Co.* deferred to the Commission's interpretation of the Act, an interpretation the Commission had already abandoned in favor of the Secretary's interpretation by the time *Melerine* was decided—and the Iowa Supreme Court—which in *Koll v. Manatt's Transportation Co.*, 253 N.W.2d 265, 269–70 (Iowa 1977), held only that violation of an OSHA standard is negligence per se as to an employee but only evidence of negligence as to nonemployees.

of any provision of the Act. Save one statement that the Act did not create "a civil cause of action against either a plaintiff's employer or a third party who is not the plaintiff's employer," *id.* at 709, *Melerine*'s holding (and the reasoning supporting it) extends no further than to the OSHA ***regulations***:

> [I]n this negligence action, we reject the argument that the failure of a third party that was not the plaintiff's employer to follow ***OSHA regulations*** establishes that third party's negligence. . . .
>
> Melerine does not . . . contend that the ***OSHA regulations*** create a civil cause of action against Avondale. He urges instead that ***their violation establishes Avondale's negligence per se*** in a cause of action given him by general maritime law. . . .
>
> The threshold issue . . . is whether Melerine was a member of the class that the ***OSHA regulations*** were intended to protect. . . .
>
> This court, . . . along with others, has held that ***OSHA regulations*** protect an employer's own employees. . . .
>
> In this circuit, . . . the class protected by ***OSHA regulations*** comprises only employers' own employees. . . . [T]his interpretation of the ***scope of coverage of OSHA regulations*** also accords with the scope of coverage explicitly given to the specific OSHA regulations at issue in this case.

*Id.* at 707, 709–12 (emphases added).[14] Even were we to assume that *Melerine*'s discussion of regulations applies to the Act as well, the decision proves, in obvious terms, that this court's prior construction of the Act was just a choice of one side of a "complex debate." The court acknowledged that it is plausible to interpret the statute, as the Secretary does, in a way that gives weight to the lack of limiting language in § 654(a)(2), but it held that it was bound to interpret the statute (or, more accurately, the regulation) consistently with precedent. This

---

[14] This court recently noted the limited reach of *Melerine*'s holding, stating that it represents the notion that "[w]e have not endorsed a non-employee's use of OSHA regulations to sue a general contractor in negligence per se." *Martino v. Kiewit N.M. Corp.*, 600 F. App'x 908, 912 (5th Cir. 2015) (per curiam); *see also Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 581 (5th Cir. 1985) ("[W]e [have] held that OSHA regulations provide evidence of the standard of care exacted of employers, and thus may *only* be used to establish negligence *per se* when the plaintiff is an employee of the defendant." (emphasis added)), *cited in Martino*, 600 F. App'x at 912.

"back-and-forth" language does not "sound like the type of decision that *Brand X* contemplated." *Rush Univ. Med. Ctr.*, 763 F.3d at 759.

*Melerine*, if it reveals anything pertinent to this analysis, reveals the court's view that the statute is open to the Secretary's interpretation. The decision is, quite simply, the opposite of "judicial precedent holding that the statute unambiguously forecloses the agency's interpretation." *Brand X*, 545 U.S. at 982–83. Again, assuming *arguendo* that its analysis applies to the Act, the *Melerine* court was guided by what it deemed "the *best* reading" of the Act; it did not hold that its reading "was the *only permissible* reading." *Brand X*, 545 U.S. at 984 (emphases in original). Thus, its interpretation is vulnerable to being supplanted by the Secretary's current interpretation.[15]

The decision in *Southeast Contractors*—a one-paragraph, per curiam opinion—turned, not on any interpretation of § 654(a)(2), but on an interpretation of a particular OSHA regulation. There, an employee of Southeast, the general contractor at a construction site, was killed when a subcontractor's employee backed a truck into him. OSHA cited *Southeast* for violating 29 C.F.R. § 1926.601(b)(4), which forbids an "employer" from using any vehicle with an obstructed rear view unless the vehicle has a reverse signal alarm or the driver, when reversing, relies on an observer to signal that it is safe to do so. *Se. Contractors, Inc.*, 1 BNA OSHC 1713 (No. 1445, 1974). Southeast contested the

---

[15] Hensel Phelps contends that *Melerine* should survive *Brand X* because it bases its holding on the legislative history of the Act. We disagree. Review of the opinion demonstrates that, in fact, it bases its holding on an *absence* of legislative history. In its scant discussion of the Act, the court quoted with approval a statement from the district court in *Horn* that "no legislative history nor statutory provision has been cited by the Plaintiff to support the proposition that Congress intended to create a duty on behalf of the employer with respect to persons other than its own employers." *Melerine*, 659 F.2d at 711 (quoting *Horn v. C.L. Osborn Contracting Co.*, 423 F. Supp. 801, 808 (M.D. Ga. 1976)). The First Circuit, faced with a similar scenario, concluded that a finding like this would not inoculate the previous interpretation against *Brand X*: "[T]he [prior] court resorted to [its holding] only because it could find no sign of a plainly discernible congressional intent. A statutory interpretation constructed on such a negative finding is antithetic to a conclusion that Congress's intent was clear and unambiguous." *Dominion Energy*, 443 F.3d at 17 (citation omitted). We agree. Citation to an absence of legislative history does not get Hensel Phelps over the line.

citation, but the Commission upheld it, finding that Southeast had "used" the truck within the meaning of the regulation. The Chairman dissented. Relying on the "general rule of agency . . . that a contractor is not responsible for the acts of his subcontractors or their employees," he argued that because the truck's operator was an employee of a subcontractor, not of Southeast, Southeast could not have been "using" the truck. *Id.* (Moran, Chairman, dissenting). He explained that the regulation's language restricts "employers," so "an employee's use of a vehicle in a manner prohibited by the standard equates to such use by his employer," making "the critical question . . . whether the tractor driver was an employee of the respondent or his subcontractor." *Id.* The Chairman's dissent does mention § 654(a)(2), *see id.* ("[T]his does not necessarily mean that the respondent is in violation of 29 U.S.C. § 654(a)(2) for every failure to comply with a safety standard which occurs within its worksite."), but does not mention it in connection with this "general rule of agency."[16] This court, in adopting the Chairman's dissent and reversing the Commission's ruling, merely approved of the "general rule that a contractor is not responsible for the acts of his subcontractors or their employees"; it did not tether that approval to any interpretation of § 654(a)(2). *Southeast Contractors'* holding is limited to its facts: because the driver of the truck was not an employee of Southeast, Southeast was not "using" the truck within the meaning of the regulation. Nothing more.

*Horn* also does not carry the day. The question raised in that case was whether a subcontractor's employee could hold a general contractor liable on a theory of negligence *per se* under Georgia law based on the general contractor's alleged violation of § 654(a). The court held that the general contractor had no duty to the plaintiff under that statute because the general contractor was not the plaintiff's "employer." *Horn*, 591 F.2d at 321. In arriving at this holding, the

---

[16] At the time of the Commission's decision, the Commission was still two years shy of adopting the Secretary's interpretation § 654(a)(2).

court again relied on the reasoning from the Chairman's dissent in *Southeast Contractors*:

> He explained that an employer cannot be held in violation of [§ 654(a)] if [h]is employees are not affected by the noncompliance with a standard. And if there was ever any doubt as to what he meant by "[h]is employee" this was eliminated by his reiteration of the general rule that a contractor is not responsible for the acts of his subcontractors or their employees. In light of this precedent and because it is conceded that [the plaintiff] was an employee of [the subcontractor], we must hold this "statutory duty" exception inapplicable.

*Id.* We find that this discussion does not rise to the level required by *Brand X*. The *Horn* court's holding does not at all approximate a holding that § 654(a)(2) unambiguously forecloses the Secretary's interpretation. At most, the holding represents the court's continued application of a previously chosen interpretation of the statute. We are aware that "[m]istakenly understanding a prior decision to have" found a statute unambiguous has "significant consequences," namely, "erroneously freez[ing] in place our 'best reading' of a statute," even though *Brand X* "specifically sought to avoid [such] 'ossification of large portions of our statutory law, by precluding agencies from revising unwise judicial constructions of ambiguous statutes.'" *SSC Mystic Operating Co. v. NLRB*, 801 F.3d 302, 319 (D.C. Cir. 2015) (Srinivasan, J., concurring) (internal punctuation marks omitted) (quoting *Brand X*, 545 U.S. at 983). We will not apply a broad general statement of law regarding the scope and application of the Act contained in a negligence decision to the entirely different question of whether the Secretary has the authority under the Act to cite a controlling employer for violating an occupational safety and health standard. *Cf. Exelon Wind*, 766 F.3d at 397–98 (declining to adopt agency interpretation of a specific regulation that would be the direct inverse of the court's previous interpretation of the same regulation, which flowed from the "plain language" of the regulation). It is our

"duty to restrict general expressions in opinions in earlier cases to their specific context." *Int'l Bhd. of Teamsters Local 309 v. Hanke*, 339 U.S. 470, 480 n.6 (1950) (plurality opinion) (citing *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399–400 (1821) (Marshall, C.J.)); *see also UC Health v. NLRB*, 803 F.3d 669, 684 (D.C. Cir. 2015) (Edwards, J., concurring) ("[G]eneral expressions" of law "cannot be confused with binding precedent," and "[t]o rely on [such] general expressions, taken from a case whose context is materially different from the case before us, flies in the face of the core principles of *stare decisis*.").

*Barrera* is wholly irrelevant. The decision in that case, an appeal by a defendant found liable for $300,000 of personal injury damages, was that the trial court correctly refused to instruct the jury that there could be no liability if the plaintiff was unusually susceptible to emotional disturbance and the defendant lacked knowledge of that susceptibility, because Texas law did not recognize that defense. *Barrera*, 653 F.2d at 917–20. The sole reference to the Act in *Barerra* comes under the heading "*Two Small Matters*," where the court chided the district court for the (ultimately) harmless error of including in its jury charge a statement that the Act required the defendant to furnish invitees a hazard-free place of employment: "[the Act] does not create duties between employers and invitees, only between employers and their employees; and it has long been settled in this circuit that, even between these latter, it creates no private cause of action." *Id.* at 920. The decision has no force here.

"Before a judicial construction of a statute, whether contained in a precedent or not, may trump an agency's, the court must hold that the statute unambiguously requires the court's construction." *Brand X*, 545 U.S. at 985. None of *Southeast Contractors*, *Horn*, *Barrera*, and *Melerine* did so. The Secretary's reasonable interpretation of the ambiguous statute must therefore govern.

## C

"It is a well-settled Fifth Circuit rule of orderliness that one panel of our

court may not overturn another panel's decision . . . ." *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008). "If, however, a Supreme Court decision 'expressly or implicitly overrules one of our precedents, we have the authority and obligation to declare and implement this change in the law." *United States v. Tanksley*, 848 F.3d 347, 350 (5th Cir. 2017) (quoting *United States v. Kirk*, 528 F.2d 1057, 1063 (5th Cir. 1976)). We will also revisit precedent where "an intervening Supreme Court decision fundamentally change[s] the focus" of the relevant analysis. *Robinson v. J&K Admin. Mgmt. Servs., Inc.*, 817 F.3d 193, 197 (5th Cir. 2016).

*Brand X* represents such a fundamental change. It requires this court to look anew at pre-*Chevron* precedent, guided by *Chevron*, to determine whether the Secretary's construction of his authorizing statute must govern and, if that construction must govern, it requires the court to disregard our precedent to the extent it conflicts. *See, e.g.*, *Palmetto Prince George Operating, LLC v. NLRB*, 841 F.3d 211, 216–17 (4th Cir. 2016) (holding under *Brand X* that NLRB's interpretation of the term "independent judgment" found in a provision of the National Labor Relations Act "supersede[s] our prior cases to the extent the two conflict"); *Hymas v. United States*, 810 F.3d 1312, 1320 (Fed. Cir. 2016) (overruling Court of Federal Claims' prior construction of "public or private agencies and organizations," as that phrase is used in the Fish and Wildlife Coordination Act of 1958, because the phrase was ambiguous and the Court of Federal Claims' construction conflicted with the Fish and Wildlife Service's subsequent construction); *Garfias-Rodriguez v. Holder*, 702 F.3d 504 (9th Cir. 2012) (en banc) (overruling precedent following *Brand X* analysis where the Board of Immigration Appeals issued a formal agency interpretation of the Immigration and Nationality Act that disagreed with court's prior interpretation of the statute); *Levy v. Sterling Holding Co.*, 544 F.3d 493, 503 (3d Cir. 2008) (overruling prior case that conflicted with SEC interpretation of its regulations because the prior case "did

not conclude that [a statute] unambiguously precluded the SEC" from taking certain action and because it "did not indicate that our reading of [two rules] flowed unambiguously from their terms"). Here, the Secretary interprets the Act in a way that directly conflicts with the rules followed in *Southeast Contractors*, *Horn*, *Berrera*, and *Melerine*. But *Brand X*, in tandem with *Chevron*, instructs us to defer to the Secretary's reasonable interpretation that § 654(a)(2) authorizes him to issue citations to controlling employers at multi-employer worksites.

## D

This brings us to the ultimate question: what of the ALJ's decision? The ALJ cited Commission precedent that an employer has a duty under § 654(a)(2) to protect all employees engaged in a common undertaking, and can be held responsible for the violations of other employers "where it could reasonably be expected to prevent or detect and abate the violations due to its supervisory authority and control over the worksite." ALJ Decision at *5 (quoting *Summit Contractors, Inc.*, 23 BNA OSHC 1196 (No. 05-0839, 2010), *rev. denied*, 442 F. App'x 570). He nonetheless concluded that he could not apply that precedent to permit the citation against Hensel Phelps because *Melerine* mandated otherwise. But *Chevron* and *Brand X* represent a change in the law. *Melerine* and its underlying cases are obsolete to the extent they conflict with the Secretary's interpretation of § 654(a)(2). Reversal is warranted.

## IV

In sum, we conclude that the Secretary of Labor has the authority under section 5(a)(2) of the Occupational Safety and Health Act, 29 U.S.C. § 654(a)(2), to issue citations to controlling employers at multi-employer worksites for violations of the Act's standards.

The Petition for Review is **GRANTED**, the Final Order of the Occupational Safety and Health Review Commission is **REVERSED**, and this cause is

No. 17-60543

**REMANDED** to the Commission for further proceedings consistent with this opinion.