[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 19-13277

————————————

FAMA CONSTRUCTION, LLC,

Petitioner,

*versus*

U.S. DEPARTMENT OF LABOR,

Respondent.

————————————

Petition for Review of a Decision of the
Occupational Safety and Health Review Commission
Agency No. 17-1173 / 17-1180

————————————

Before WILSON, NEWSOM, and ED CARNES, Circuit Judges.

PER CURIAM:

Fama Construction, LLC, regularly hires roofers, and those roofers regularly violate Occupational Safety and Health Act regulations. After a bench trial, an Administrative Law Judge found Fama liable for those violations based on two alternative theories. Either the roofers were Fama's "employees," or Fama was their "controlling employer" according to an agency doctrine that recognizes the authority of multiple employers to control workers on a job site.

Substantial evidence supports the conclusion that Fama was the roofers' controlling employer. As a result, we deny Fama's petition for review.

## I.

Fama's website describes it as a "roofing contractor, employing over 50 people, who all share in the pride of providing top quality materials, professional installations, and dependable warranties to both residential and commercial roofing customers." There are only three or four employees who work in Fama's office. Those employees receive blueprints from building companies and quote a price for installing a roof.

Fama supplies the labor. When it has a job available, Fama contacts a crew, sends the crew a description and pictures of the job, which the crew either accepts or declines. The crew, not Fama, decides how many roofers it needs to complete the job.

Fama usually isn't involved in selecting the individual members of its work crews.  It usually works with the same crews; it has worked with some of them for more than 10 years.

Fama also supplies the materials.  Once Fama gets a roofing job, it orders the materials and arranges for them to be delivered to the jobsite.  To prevent theft, Fama prefers that its work crews arrive at the site soon after the materials for the job are delivered.  But for most jobs Fama doesn't require that its crews arrive at a particular time or that they work for a particular number of hours a day.[1]  The crews decide when to arrive and how long to work.  Fama doesn't "really have . . . a time frame" for the crews to complete a house, but crews usually complete each house in about a day.

Fama pays each crew a non-negotiable price per job based on the square footage of the roof.  Crews submit weekly invoices to Fama documenting the number of square feet that crew completed that week, and on Fridays Fama issues a check to each crew.  The crew members divide the pay among themselves.  Although the crews supply their own tools and equipment for the job, they sometimes buy them using Fama's credit with its permission.  When that happens, the crew pays Fama back, sometimes in installments.

---

[1] Occasionally Fama will contract directly with a homeowner for roofing repair work.  When that happens, it schedules a time for the roofers to arrive that is convenient with the homeowner.

At times, Fama has provided its work crews with safety equipment: fire extinguishers, safety kits, and hard hats.  Fama also provides safety training to its work crews every four to five months.  The training meetings are mandatory, and although the crews are "generally compliant" with Fama's instruction to attend, if a crew were to "refuse[] to come to safety trainings," it would be less likely to be hired by Fama in the future.  Fama provides the crews with a safety program and requires that its crews follow it.  Fama also forbids workers from using cell phones while working on a roof or while driving to a Fama jobsite.  It also has the "authority to require workers to stop unsafe work" on Fama jobsites.

To provide a framework for exercising that authority, Fama has a "progressive discipline system in place."  When it learns that a crew member has failed to use proper safety equipment on a jobsite, it requires the worker to watch a safety video.  If that does not change the behavior, it can impose a fine, although it has never taken that step.  Fama managers have on unusual occasions directly disciplined workers for safety violations when the managers happened to see the violation.  A Fama manager sent a worker home for the day because he wasn't wearing a safety harness, and the owner of the company did the same to another worker who failed to obey his instruction to wear a safety harness.

Fama's problem is not the lack of a safety program on paper, and it is not as though the company has never enforced it.

The problem is that Fama has made no effort to systematically enforce its safety requirements.  Usually, the managers only visit the jobsites before the roofing begins and after it is completed.  Fama itself has described the times its managers visited jobsites while work was in progress as "incidental" — the managers were not conducting safety inspections, they just happened to be at the jobsite and observed a safety violation.  Br. of Petitioner at 31.  As one of its managers testified, "Fama does not go out intentionally checking on workers to make sure they're working safely."  There is no evidence that a Fama manager has ever gone to a job site for the purpose of conducting a safety inspection.  Not once.

But OSHA Compliance Safety and Health Officer Marc Greenfield does conduct safety inspections.  When this case began, he had personally conducted at least six separate safety inspections at Fama jobsites.  In the inspections leading to this litigation, Greenfield went to two Fama jobsites in Lawrenceville, Georgia.  He took photographs of the workers from a distance, then approached the jobsites for a closer look.

At the first jobsite, Greenfield saw roofers working without proper fall protection, using a ladder that did not extend high enough above the roof the workers were using it to reach, and using a nail gun without the required safety glasses.  He spoke with a roofer there who identified himself as Alberto.  Greenfield asked him if he was an employee or a subcontractor.  Alberto said that he and the crew of roofers on the other jobsite were all Fama employees.

6                    Opinion of the Court                    19-13277

At the second jobsite, Greenfield saw roofers working without proper fall protection, using nail guns without proper eye protection, and using a ladder that was too short and not secured. Greenfield spoke with Antonio Cardenas who identified himself as the supervisor of his four-man crew. When asked, Cardenas told Greenfield that he was a Fama employee, not a subcontractor.

Greenfield's inspections led him to recommend that Fama be cited for violating several safety regulations. His recommendations led the Secretary of Labor[2] to issue Fama two citations in June 2017 for violations of three safety regulations: 29 C.F.R. § 1926.102(a) (eye protection), 29 C.F.R. § 1926.501(b)(13) (fall protection), and 29 C.F.R. § 1926.1053(b)(1) (ladder safety); *see* 29 U.S.C. § 658(a) (authorizing the Secretary to "issue a citation to [an] employer" that the Secretary believes has violated its duty to provide a hazard-free work environment).

---

[2] The Secretary of Labor has assigned responsibility for enforcement of the Occupational Safety and Health Act to the Assistant Secretary for Occupational Safety and Health, who heads OSHA. *See* Order No. 4–2010 (75 FR 55355). The Assistant Secretary has redelegated his authority to issue citations and proposed penalties to OSHA's Area Directors. *See* 29 C.F.R. §§ 1903.14(a), 1903.15(a). For simplicity, we refer to actions taken by the Assistant Secretary and the Area Directors as actions taken by the Secretary, who ultimately "has rulemaking power and establishes the safety standards; investigates the employers to ensure compliance; and issues citations and assesses monetary penalties for violations." *ComTran Grp., Inc. v. U.S. Dep't of Lab.*, 722 F.3d 1304, 1307 (11th Cir. 2013).

The Secretary has cited Fama for safety violations before. In the five years before the citations at issue in this petition, the Secretary had cited Fama nine times. Those citations were resolved through settlement agreements. The two citations at issue here were not settled. Because Fama contested them, the Secretary filed two complaints with the Occupational Health and Safety Review Commission, and the cases were referred to an ALJ and consolidated for a bench trial. See 29 U.S.C. § 659(c) (providing that if a cited employer contests a citation within 15 days of its issuance, the Commission shall afford an opportunity for a hearing pursuant to 5 U.S.C. § 554(a)(3)).

The ALJ considered all of the testimony he heard, made credibility determinations where there were conflicts in the testimony, and applied the multi-factor test from *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992), for determining whether a person was an "employee." That led the ALJ to determine that the workers were Fama's employees and that Fama was liable for their safety violations.

Alternatively, the ALJ determined that Fama was liable as a "controlling employer" under OSHA's "multi-employer citation policy," because Fama had failed to conduct jobsite inspections despite an "extensive history of OSHA violations" by workers on those sites. The ALJ affirmed OSHA's citations and assessed $282,834 in penalties.

Fama petitioned the Commission for review of the ALJ's decision, but the Commission declined to review it. The ALJ's

decision became a final order of the Commission, *see* 29 U.S.C. § 661(j); 29 C.F.R. § 2200.90(f), and Fama petitioned this Court for review of it.

## II.

"On review, Commission decisions are entitled to considerable deference." *Quinlan v. Sec'y, U.S. Dep't of Labor*, 812 F.3d 832, 837 (11th Cir. 2016); *see also Fluor Daniel v. Occupational Safety & Health Rev. Comm'n*, 295 F.3d 1232, 1236 (11th Cir. 2002). We must uphold the ALJ's findings of fact if they are "supported by substantial evidence on the record considered as a whole." *Quinlan*, 812 F.3d at 837 (quotation marks omitted). Substantial evidence is "more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (quotation marks omitted).

We will uphold the ALJ's conclusions of law so "long as they are not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). The ALJ was "bound to follow the law of the circuit to which the case would most likely be appealed." *Id.* Because the citations were issued for OSHA violations in Georgia, the ALJ was bound by our circuit's law.

To establish an OSHA violation, the Secretary must show "(1) that the regulation applied; (2) that it was violated; (3) that an employee was exposed to the hazard that was created; and . . . (4) that the employer knowingly disregarded the Act's re-

quirements." *ComTran*, 722 F.3d at 1307 (quotation marks omitted). Fama challenges the third element of that test, contending that the roofers were not its employees within the meaning of the statute. It is the Secretary's burden to show that they were. *See Quinlan*, 812 F.3d at 836 ("To satisfy the third element, the Secretary bears the burden of showing that the cited respondent is the employer of the exposed workers at the site."). The ALJ found that the burden was satisfied and the roofers were Fama employees.

An employment relationship, however, is not the only basis for liability when a company fails to take reasonable steps to protect worker safety. The ALJ ruled that even if the roofers were subcontractors instead of Fama's employees, "Fama was a controlling employer" and was liable under OSHA's multi-employer citation policy.

That controlling employer policy provides that "[a]n employer who has general supervisory authority over [a] worksite," must "exercise reasonable care to prevent and detect violations on the site." OSHA Instruction CPL 02-00-124, Multi-Employer Citation Policy § X.E.1–2 (Dec. 10, 1999). The ALJ found that Fama was a controlling employer under that policy because it "had the power to correct safety violations and exercised considerable control over the work crews."

In its petition for discretionary review before the Commission, Fama did not challenge the validity of the multi-employer citation policy, which includes liability for controlling employers.

It did not argue that it could not be held liable for safety violations based on its general supervisory authority over the job site. That bars Fama from making that challenge now. *See* 29 U.S.C. § 660(a) ("No objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").

Even if § 660 did not bar Fama from arguing that it could not be held liable as a controlling employer for safety violations by another company's employees, we would not be persuaded by its argument, which relies on *Southeast Contractors, Inc. v. Dunlop*, 512 F.2d 675 (5th Cir. 1975).[3] That decision preceded OSHA's adoption in 1976 of the multi-employer citation policy, which provides for liability based on supervisory authority over a jobsite. *See Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 820 (8th Cir. 2009) (explaining that the Commission "announced its revised position" that controlling employers have a duty "to comply with OSHA standards" in two 1976 decisions). As a result, the *Southeast Contractors* decision could not, and did not, hold the yet-to-be-adopted policy invalid. *See, e.g., Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003) ("Whatever their opinions say, judicial decisions cannot make law

---

[3] *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981).

beyond the facts of the cases in which those decisions are announced.").

Besides, the Fifth Circuit itself has recognized that "*Southeast Contractors*' holding is limited to its facts" and the OSHA multi-employer policy, with its controlling employer rule, is valid. *See Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 743 (5th Cir. 2018) (holding "that the Secretary of Labor has the authority under section 5(a)(2) of the Occupational Safety and Health Act, 29 U.S.C. § 654(a)(2), to issue citations to controlling employers at multi-employer worksites for violations of the Act's standards").

Substantial evidence supports the ALJ's application of the controlling employer rule to the specific facts of this case. Under Commission precedent, a controlling employer is one that "could reasonably be expected to prevent or detect and abate [OSHA] violations due to its supervisory authority and control over the worksite." *Stormforce of Jacksonville, LLC*, No. 19-0593, 2021 WL 2582530, at *3 (OSHRC Mar. 8, 2021) (quotation marks omitted). The type of control required is not control over "the manner and means by which the [work] product is accomplished," *Darden*, 503 U.S. at 323, but control over matters affecting the safety of the workers on the jobsite. While Fama may not have controlled the daily activities of the work crews, substantial evidence supports the ALJ's finding that the company did have the authority and ability to control the workers' use of safety equipment and adherence to safety procedures.

As we have mentioned, a Fama manager sent a worker home for not wearing a safety harness and the owner of the company sent another worker home for failing to follow safety instructions. Fama prohibited workers from using cell phones while working on its jobsites or driving to and from them. It required work crews to attend safety training and would bump crews down the hiring list if they failed to attend. Fama had a "progressive discipline system in place" that started with a required safety video and progressed to fines and termination, and it had "the authority to require workers to stop unsafe work." Based on the evidence presented, Fama "could reasonably be expected to prevent or detect and abate [OSHA] violations" occurring on its jobsites. *Stormforce*, 2021 WL 2582530, at *3.[4]

Substantial evidence also supports the ALJ's finding that Fama "did not meet its duty to exercise reasonable care." A controlling employer is liable for OSHA violations when it fails to "exercise reasonable care to prevent and detect violations on the [work]site." OSHA Instruction CPL 02-00-124, Multi-Employer Citation Policy § X.E.2. A controlling employer's obligation is "to take reasonable measures to prevent or detect the violative conditions." *Stormforce*, 2021 WL 2582530, at *8 (quotation marks

---

[4] Fama also argues that the ALJ's opinion is inconsistent because it first found an employee-employer relationship between Fama and the work crews and then found Fama liable as a controlling employer. This argument has no merit. A fair reading of the ALJ's opinion makes clear that it found Fama liable as a controlling employer as an alternative ground for liability.

omitted). We assess a controlling employer's conduct "in light of objective factors," including the "safety history" of the contractors involved. *Id.* (quotation marks omitted).

The record shows that Fama knew that its workers were not following OSHA's safety requirements. It usually worked with the same work crews, and it had been cited for OSHA violations nine times. It had entered a number of settlement agreements in which it promised to improve worker safety by training its workers and ensuring compliance with OSHA standards. As part of one of those agreements, Fama was required to hire a third-party contractor to conduct monthly safety audits. The ALJ credited testimony that the settlement agreements had put Fama "on notice that to meet the standard of reasonable care, more frequent inspections of the usual work crews hired to complete its roofing jobs were required."

But Fama failed to conduct "more frequent inspections." There is no evidence that it conducted any inspections at all. In its brief to this Court, Fama concedes that it made "only rare worksite visits" which "limit[ed] its opportunity to observe hazards." It describes those opportunities as "incidental" and states that any "attempts at safety enforcement . . . would have been fleeting, ineffective, and disregarded by the subcontractors' roofing crews as soon as Fama representatives left the jobsite." Fama knew that its workers had a history of violating OSHA's safety protocols, it had the authority "to prevent or detect and abate

14                 Opinion of the Court                 19-13277

[those] violations," and it failed to exercise that authority. *Storm-force*, 2021 WL 2582530, at *3.

When a controlling employer does not "exercise reasonable care to prevent and detect violations on the [work]site," it is liable for the OSHA violations of its workers. OSHA Instruction CPL 02-00-124, Multi-Employer Citation Policy § X.E.2. That is what the ALJ found happened here, and substantial evidence supports that conclusion. The petition for review is DENIED, and the Commission's final decision is AFFIRMED.

**AFFIRMED**.

19-13277                Newsom, J., Concurring                        1

NEWSOM, Circuit Judge, concurring in the judgment:

I agree with the Court's judgment denying Fama's petition for review and affirming the Commission's final decision.  In my view, substantial evidence supports that ALJ's determination that the roofers were Fama's employees.  Accordingly, I wouldn't reach the question whether Fama was a "controlling employer" under OSHA's multi-employer-worksite doctrine.